PEOPLE v. HOFFMANN.

1. CRIMINAL LAW—CONVICTION—RECORD—SUFFICIENCY.

On review of a criminal case in which the respondent stood mute and presented no testimony, the legal sufficiency of the people's case is to be considered, which involves: (1) A sufficient information, which includes the proper charging of an offense within the statute, and within the jurisdiction of the court in which the information was presented; (2) proof, beyond a reasonable doubt, of each element of the crime charged in the information; (3) the use of testimony legally competent and material to prove the crime charged; and (4) submission to the jury of none but proper issues of fact under proper instructions.

2. INFORMATION—SUFFICIENCY—TIME AND PLACE.

Where time and place are once particularly described in an information, subsequent allegations that respondent did "then and there" commit the acts charged are sufficient.

3. FALSE PRETENSES—INFORMATION—VARIANCE—TIME.

Time is not of the essence of the offense of obtaining the money of the State by means of false pretenses, notwithstanding the fact that, on the date stated, the circumstances attending the committing of the offense charged were such that respondent might have been charged, in another jurisdiction, with the offense of having by false pretenses obtained a warrant upon the State treasurer.

4. SAME—AMENDMENT—STATUTE.

Time not being of the essence of the offense of obtaining money by means of false pretenses (§ 11575, 3 Comp. Laws) an information may be amended to conform to the proof in that respect under sections 11919 and 11922, 3 Comp. Laws.

5. SAME—VARIANCE.

Where, on the trial of an information in Detroit, for obtaining the money of the State by means of false pretenses, it appears that the false pretense was made by means of a voucher, which, after being allowed by a judge of the Wayne circuit court in Detroit, was sent by respondent to the auditor general, who issued his warrant upon the State treasurer, who, in turn, issued a check upon a State depository in Detroit, which respondent cashed, respondent's contentions that his

representation was made only to the circuit judge, and had no operation beyond the auditor general, are unsound.

6. SAME—CORONERS — INQUESTS — STATE CASES — FEES — ALLOWANCE BY CIRCUIT COURT.

The allowance by the circuit court of a coroner's claim for services and expenses in holding an inquest over the body of a "stranger," under section 11828, 3 Comp. Laws, is not a judgment in the sense that it is a verity and estops the State from prosecuting the coroner for obtaining the money by false pretenses, the claim being fraudulent.

7. SAME—VENUE.

In a prosecution of a coroner for obtaining the money of the State by means of a false pretense, consisting of a fraudulent claim for services and expenses in holding an inquest, the venue is properly laid in the city in which began the chain of circumstances intended to secure, and which did eventually secure, the payment of the money to him in that city.

8. CRIMINAL LAW—EVIDENCE—RESIDENCE—CITY DIRECTORIES.

On the issue of the fraudulent intent of a coroner in falsely certifying, on a voucher, that a deceased person, over whose body he had held an inquest, was a "stranger," city directories shown to have been a part of his official library, and from which it appeared that the deceased had resided and done business at the same place in the city for years, were admissible.

9. SAME—BEST EVIDENCE.

The directories being in evidence, the fact that a witness was permitted to read from them, it not being claimed that a false reading was made, does not constitute error.

10. SAME—EVIDENCE—COLLATERAL CASES—CITY DIRECTORIES.

Vouchers in many similar cases, claimed to have been fraudulent for like reasons, being in evidence, the city directories were admissible with respect to the residence of the persons named therein.

11. SAME — EVIDENCE — OTHER OFFENSES — KNOWLEDGE AND INTENT.

On the issue of the fraudulent intent of a coroner, in falsely certifying on a voucher that a deceased person, over whose body he had held an inquest, was a "stranger," vouchers in some 40 similar cases, with evidence to the effect that in many of them the deceased had been a long time resident of the city, that inquests in many cases were not, in fact, held, and that autopsies and other services charged for were not rendered, were admissible.

12. SAME.
   Evidence that the deceased person in one of the collateral cases had been a member of a local trade union for five years was admissible.

13. SAME—MATTERS OCCURRING IN RESPONDENT'S ABSENCE.
   The statements of the witnesses at one of the alleged inquests being shown to have been made in respondent's absence, a motion to strike them out for that reason was properly denied, since no inquest could be held in the coroner's absence, and without an inquest any demand for fees was fraudulent.

14. SAME—OPINIONS—HARMLESS ERROR.
   The coroner's clerk, having testified to procuring statements from hospital physicians that deceased was a "stranger," and it clearly appearing that deceased had lived and done business at the same place in the city for several years, a further statement by the witness that he procured the statements for the purpose of making a "State case" was not prejudicial, the purpose being apparent.

15. SAME—EVIDENCE—ADMISSIBILITY.
   The physician may properly state what was said at the time of making the statement, though she contradicts the clerk, she having testified that her recollection was that the coroner and not the clerk took the statement.

16. SAME—OPINIONS—HARMLESS ERROR.
   It was not reversible error to permit the physician to state that by signing the statement containing the words "she was a stranger," she meant that the deceased was a stranger to her.

17. SAME—ADMISSIONS—AFFIDAVIT FOR CONTINUANCE:
   An affidavit for continuance, in which respondent sets out what he expects to prove by an absent witness, is properly received in evidence against him, the witness, on being produced, having testified to the opposite and to facts tending to show that respondent knew the facts when making the affidavit.

18. SAME—FALSE PRETENSES—EVIDENCE.
   Testimony of the physician who made the post mortem examination, that he received no pay for it, is admissible, a fee therefor being included in the voucher.

19. SAME—EXPERT EVIDENCE—HARMLESS ERROR.
   Testimony of the physician as to the reasonableness of the fee for post mortems in certain hypothetical cases was immaterial but harmless.

20. FALSE PRETENSES—EVIDENCE.
    Testimony by the deputy auditor general that he relied upon respondent's certificate was proper.

21. SAME—INSTRUCTIONS—KNOWLEDGE AND INTENT.
    On a prosecution for obtaining money by false pretenses, instructions with respect to the necessity of proving respondent's knowledge of the falsity of his official certificate beyond a reasonable doubt examined, and *held*, not misleading.

22. CRIMINAL LAW—INSTRUCTIONS—REASONABLE DOUBT.
    Instructions defining reasonable doubt examined, and *held*, not misleading as a whole because stating that a reasonable doubt is one that grows out of the evidence in the case and for which a reason can be given.

23. SAME—NEW TRIAL—MOTION—COUNTER SHOWING—DETERMINATION—REVIEW.
    Where, on motion for new trial in a criminal case on the ground of failure of a juror to make honest answers to questions on his voir dire, a counter showing is made, the determination of the trial court thereon will not be disturbed on error.

24. SAME—MISCONDUCT OF OFFICERS.
    The fact that officers in charge of the jury in a criminal case were present in the court-room adjoining the jury-room during the deliberations of the jury, that they could hear some of those deliberations, that they looked through the keyhole of the jury-room to see what the jurors were doing, and that the jury knew of and commented on the officers' conduct, is not ground for new trial, in the absence of anything to show that the verdict of the jury was affected by such conduct.

25. SAME—CONDUCT OF TRIAL—ADDITIONAL INSTRUCTIONS.
    Where instructions correctly state the law, the fact that they are given after the jury has once retired will not render them erroneous, and it will not be presumed that they are given to coerce a verdict.

Error to recorder's court of Detroit; Murphy, J. Submitted November 17, 1905. (Docket No. 247.) Decided December 30, 1905.

John T. Hoffmann was convicted of obtaining money by false pretenses and sentenced to imprisonment for not less than four years in the State prison at Jackson. Affirmed.

During the years 1903 and 1904 respondent was one of the coroners for the county of Wayne. Chapter 329 of the Compiled Laws of 1897, entitled "Proceedings for the Discovery of Crime," provides for inquests upon the view of the dead bodies of persons who have come to their death suddenly or by violence. The proceeding involves the summoning of a jury of six men, to whom in view of the dead body an oath is to be administered, the summoning of witnesses, and—

"In all such cases it shall be lawful for the magistrate taking any such inquest, to require, by subpœna, the attendance of a competent physician or surgeon for the purpose of making a post mortem examination, and of testifying as to the result of the same." 3 Comp. Laws, § 11821.

An oath, the form of which is given, is required to be administered to each witness. In cases where it is supposed that any murder or manslaughter has been committed, the testimony of all witnesses is required to be reduced to writing by the justice or coroner, or by some person by his direction, and subscribed by the witnesses. The jury is required to draw up and deliver to the justice or coroner their inquisition under their hands, in which they shall find and certify when, in what manner, and by what means the deceased came to his death, and his name, if known. If death resulted from unlawful means, implicated persons are to be named, if known. Witnesses may be required to recognize for appearance in court, and, upon refusal, may be committed. It is also provided (3 Comp. Laws, § 11828) that if the coroner shall certify:

"That to the best of his knowledge and belief the person found dead was a stranger not belonging to this State, the expenses of the burial, with the justice's [or coroner's] fees, and all the expenses of the inquisition, if any were taken, shall be paid to the justice of the peace [or coroner] from the State treasury, the account of such expenses and fees being first allowed by the circuit court for the county; in all other cases the expenses and fees shall be paid by the county in which the inquisition was taken."

On January 6, 1904, one Josephine Summers, of 446 Sixth street, in the city of Detroit, was found at her home, which was also her place of business, suffering from a gunshot wound in her head. She had lived at the same place, which she rented, for seven years, and had been prior to that time for at least two years living in the city of Detroit. She had one child, a son, born in Detroit in 1895. She was conveyed to the Emergency Hospital, and there, on January 29th, she died as a result of the said wound. In the presence of doctors and students of the Michigan College of Medicine, a post mortem examination was made at the hospital by a physician, for which no charge was made to any one, and for which the physician who made it received no pay. On February 3d, respondent held an inquest, at which four witnesses testified; their statements being taken in longhand by one James A. Hinchman, one of the coroner's clerks, and signed by the witnesses. The statements, other than that of Dr. Smith, who performed the autopsy, were as follows:

Harry Schrum, 565 Brooklyn:

" Knew Mrs. Summers. Lived near her; was in front of Dr. Judson's when I heard a woman scream; found it was Mrs. Summers; ran over to her and found her just outside the door. Didn't see any one come out of Mrs. Summers' place. When I got to her, she told me she had been shot. I ran for Dr. Judson. She wouldn't tell who shot her. In fact, she didn't say anything, and I saw no one around there; didn't even hear any pistol shot. I had been around there ten or fifteen minutes."

Mrs. Mead, 499 Grand River Avenue:

" Knew Mrs. Summers; was in vicinity at time Mrs. Summers screamed; ran through to front and looked out. I didn't see any one. I saw Mrs. Summers outside of her door; went to her, and she said she was shot in the head. She said man shot her and then he went right out her door. She didn't know him, a tall man, black mustache, black clothes. She gave no further information; hadn't seen any man around there, or any one who acted sus-. picious About 4:30 or 5 I saw man who answered somewhat that description; didn't know who he was. He had

a soft hat on. Had never seen the man around there be-fore."

Bert High, police officer:·

"Mrs. Summers lived 446 Sixth street. On Sunday, January 10th, was sent up to her. Mrs. Summers told me she heard the door open; she stepped to center of floor; saw tall, thin man; without his saying a word, he shot her. She didn't know who he was; never saw him be-fore. Mrs. Summers was 42 years old. She had been married, but separated from her husband."

On the same day on which the inquest was held, two further statements were procured, either by the respond-ent or the clerk, Hinchman, and placed in the files. Those statements, which were procured at Emergency Hospital, read as follows:

House physician at Emergency Hospital:

"Did not know Mrs. Summers, deceased, before she was brought to the hospital. She was unknown to me, and, from all I know, she was a stranger in the city.
[Signed]　　　"W. H. CASE."

"Mrs. Josephine Summers was brought to Emergency Hospital on January 6, 1904. She was suffering from a wound in the forehead above the left eye. I did not know anything about her before she was brought to the hospital. She was a stranger.
[Signed]　　　"DR. I. S. STONE."

Respondent made, upon a printed form, a bill or state-ment of the cost and expenses of this inquest against the State of Michigan, attached his certificate, presented the same to one of the judges of the circuit court for the county of Wayne, who, without inquiry or evidence be-yond the account itself and the coroner's certificate, certi-fied to the claim. It was sent by mail to the auditor gen-eral, received by him on February 5, 1904, and he drew his warrant on the State treasurer, dated the same day, sent it to the State treasurer with a check slip asking for a check payable to John T. Hoffmann, the respondent. The deputy State treasurer received the warrant and check slip, put a "Paid" stamp on the warrant, made a charge

of the amount of the check against respondent, credited the State Savings Bank of Detroit, on which the check was drawn, with the amount of the warrant, and sent the check to the auditor general—all on February 5th. The deputy auditor general, on the same day, mailed the check to the respondent at Detroit. Respondent received the check, and, on February 6, 1904, upon presentation at the State Savings Bank of Detroit, the money. This bank was a depository of State funds. The check was paid out of the general cash of the bank, and no representations were made to the bank or its officers beyond the presentation of the check for the purpose of securing its payment. The course of dealing indicated was precisely the same as theretofore many times followed by respondent and by the representatives of the State. The account, with the certif. icates so presented by respondent to the State, was in words and figures as follows:

"Voucher No.———.
"Warrant No.———.
          "Coroner's Fees, $56.34.

"STATE OF MICHIGAN, ⎱
     County of Wayne.  ⎰

"I hereby certify that the within account is correct and lawful, that the services were rendered as stated, and that the deceased person was a stranger not belonging to this State.
                    "JOHN T. HOFFMANN,
                              "Coroner.

"February 3, 1904.

"STATE OF MICHIGAN.—In the Circuit Court for the County of Wayne.

"The within account of John T. Hoffmann, coroner of said county, is hereby approved in open court at the sum of $56.34.
                    "J. W. DONOVAN,
                              "Circuit Judge.

"Audited, Feb. 3d, 1904.

"STATE OF MICHIGAN.
              " To John T. Hoffmann, Coroner, Dr.
       " 1904.
" To fees and expenses in holding inquest on body of Mrs. Josephine Summers, found dead at Detroit, in the county of Wayne, on the 29th day of January, 1904, as follows:

| "Date. | Items. | Dollars. | Cents. |
|---|---|---|---|
| " Coroner's fees: | | | |
| " Viewing body, taking and holding inquest thereon $3.00 | | $3 | 00 |
| " Traveling fees, 4 miles at 6c. each | | | 24 |
| " For issuing a venire, 25c. | | | 25 |
| " For issuing 4 subpœnas, 25c. each | | 1 | 00 |
| " For issuing warrant, 25c. | | No charge. | |
| " For swearing 4 witnesses (not exceeding 5) at 10c. each | | | 40 |
| " For transcribing testimony, 4 folios at 10c. each (where murder is supposed to have been committed) | | | 40 |
| " For taking a recognizance, 25c. | | No charge. | |
| " Officer's fees: | | | |
| " Summoning jury, 75c. | | | 75 |
| " Attending jury, 50c. | | | 50 |
| " Serving 6 subpœnas, at 15c. each | | | 90 |
| " Traveling 12 miles, at 10c. each | | 1 | 20 |
| " Jurors' fees: | | | |
| " Six jurors, 1 day each, at $1.50 per day and 75c. for each half day | | 9 | 00 |
| " Twelve miles travel at 10c. each | | 1 | 20 |
| " Witnesses' fees: | | | |
| " Four witnesses at 75c. each per day and 37½c. for each half day | | 1 | 50 |
| " Sixty miles travel at 10c. each | | 6 | 00 |
| " Undertaker's bill: | | | |
| " Coffin, caring for body, and interment, post mortem examination | | 30 | 00 |
| " Total | | $56 | 34 |

" $56.34.
" Received of the Auditor General a warrant upon the Treasurer of the State of Michigan for the sum of fifty-six and 34-100 dollars, in full of the above account.
       " Lansing,——, 1904.
                        " JOHN T. HOFFMANN,
                                " Coroner."

The body was not buried by the coroner, and the item of $30 is claimed to be the fee for conducting the post mortem examination. .

The information against the respondent was presented

to the recorder's court of the city of Detroit on December 6, 1904. Respondent was arraigned on the same day, and stood mute. He moved to quash the information. This motion being overruled, on December 10th a further motion to quash the information and a demurrer to the information were interposed. Both the motion and the demurrer presented substantially the same objections, which were that the information showed upon its face that no offense had been committed against the laws of the State of Michigan, and that the recorder's court of the city of Detroit had no jurisdiction to try respondent; it not appearing that an offense had been committed in the city of Detroit. These questions being determined against respondent, the case was set down to be tried December 17th, and on that day the impaneling of the jury began. As discussion proceeds, and as may be necessary, further reference will be made to the testimony.

*Charles T. Wilkins, James O'Hara,* and *C. D. Joslyn,* for appellant.

*Ormond F. Hunt,* Prosecuting Attorney, and *Louis C. Wurzer,* Assistant Prosecuting Attorney, for the people.

OSTRANDER, J. (*after stating the facts*). Before examining in detail the errors assigned, some general observations, based upon the record, may profitably be made. The holding of an inquest is not a perfunctory performance. The case of Josephine Summers was one illustrative of those within the legislative contemplation and definition as expressed in the statute providing for inquests. She had come to her death by violence, the nature and circumstances of which strongly indicated that a murder had been committed. Apparently an inquest, and such expert examination of the body as would furnish thereafter available evidence of the nature of the wound and the cause of death, was proper. Conducted in good faith and in a lawful manner, the proceedings would

present an instance of the performance by the coroner of official duty. If the woman was a resident of Wayne county, the cost of the inquest, after audit, would be paid from the treasury of the county; if she was a stranger, and so certified, upon the best knowledge and belief of the coroner, to be, the account of the expenses and fees, being first allowed by the circuit court for Wayne county, was payable out of the treasury of the State. It is not claimed that respondent did not, pro forma at least, conduct an inquest in the case of Josephine Summers. The charge in the information, preferred under 3 Comp. Laws, § 11575, is that respondent, intending to cheat and defraud the State of Michigan, did designedly, by means of a false pretense or by means of false pretenses, obtain from the State a sum of money. Stated generally, the means charged to have been used to perpetrate the alleged crime was the presentation to the State of an account for fees and disbursements in conducting the inquest in the case of Josephine Summers. As the respondent stood mute, and, excepting the evidence of certain witnesses who testified to his general reputation for honesty, presented to the jury no testimony, it is the legal sufficiency of the case made by the people which is to be considered. This involves:

(1) A sufficient information, which includes the proper charging of an offense within the statute and within the jurisdiction of the court in which the information was presented; (2) proof, beyond a reasonable doubt, of each element of the crime charged in the information; (3) the use of testimony legally competent and material to prove the crime charged; and (4) submission to the jury of none but proper issues of fact under proper instructions.

It is contended here that in none of these respects is the case legally sufficient. It is further contended that the verdict is vitiated by circumstances arising after the jury had been charged and had retired to deliberate upon their verdict.

The averments of time and place in the information as

filed are " on the 5th day of February, A. D. 1904, at the city of Detroit, in the county of Wayne." Respondent is charged with having "then and there" made the representations, deceived the State, and obtained the money. Upon the face of the information jurisdiction appears, and this is not seriously debated. Near the close of the people's case, it appearing from the evidence that no money was obtained by respondent on the 5th day of February, and that he did obtain it on February 6th, the prosecuting attorney was granted leave to amend the information so as to aver the money to have been obtained on February 6th. The objection made was, " There is no basis for it," to which the trial judge responded:

"I do not think I have any discretion in this matter at all. I think I am compelled, under the statute of amendments, to allow the amendment."

An exception was entered, and error assigned upon the ruling. The argument is that under the circumstances of the particular case, time is of the essence of the offense charged, and the amendment amounted to the statement of a new case. Time is not of the essence of the offense of obtaining money by means of false pretenses. The fact that in the particular case it is made to appear that on the date stated in the information the circumstances attending the committing of the offense charged were such that respondent might have been charged, in another jurisdiction, with the offense of having by false pretenses obtained a warrant upon the State treasurer, does not make time of the essence of the offense. The point must be ruled precisely as it would be if there were no such circumstances intervening between the pretenses and the obtaining of the money. The amendment was properly allowed. 3 Comp. Laws, §§ 11919, 11922.

The court, upon the suggestion of counsel for respondent, held that but a single false pretense is charged to have been made. The jury were instructed, in accordance with such ruling, that unless the representation that the

deceased person was a stranger not belonging to this State, appearing in the certificate of respondent attached to the account, was, within the best information and belief of respondent, knowingly, falsely made, they must acquit. It is the theory of counsel that, if respondent obtained anything from the State of Michigan by reason of representations made by him, it was a warrant drawn by the auditor general upon the State treasurer; that it was the auditor general who, receiving the voucher and the representations it contained, drew a warrant upon the treasurer of the State, and the pretenses had no further effect, because presented to no other State officer. No other officer of the State had knowledge of the representations made. The method of obtaining the money which the information charged was obtained after the warrant of the auditor general was drawn, was a method in which the reliance of the State officers was upon the warrant and upon nothing else, and of the bank officers upon the treasurer's check and upon nothing else. If this contention is sound, it operates, not only to avoid the jurisdiction of the trial court, but to establish the infirmity of the information, in which it is expressly charged that what respondent received by means of the false pretenses was money.

It is also further contended that the auditor general, and so the State, was not deceived by respondent's pretenses, because reliance was not placed upon them; that the account, as presented and paid, had been audited and allowed by proper authority; that such audit and allowance was by law required, and was indispensable; that if the certificate of the circuit judge, showing audit, had been wanting, no warrant would have been drawn, and, being present, the auditor general was required by law to issue the warrant; that, if respondent made false representations, they were to the circuit court for the county of Wayne to procure the account to be audited, and, if deception was practiced, it had no effect beyond the auditing officer. Whatever apparent force these arguments have

is much diminished by a simple statement of facts. Money cannot be obtained from the State treasury, regularly, except upon the warrant of the auditor general. Any attempt to get it, honestly or dishonestly, except, perhaps, by burglary, involves the fact of a warrant of the auditor general. Respondent was aware of this, and had by repeated experiences so procured the money of the State to be paid to him. He knew, also, that as a preliminary to the issuing of the warrant, the certificate of the circuit judge had been and would be required. Such a certificate had no force or effect, unless accompanying a coroner's voucher, in a case represented to be that of a stranger. If the certificate made by the coroner had been to the effect that the services were rendered to a citizen of Detroit, and if by fraud or mistake the judge had added his certificate, no warrant would have been demandable. Both the presumptions that official duty is performed and the plainest dictates of reason negative the idea that the warrant of the auditor general could have been procured, unless the voucher evidenced a demand against the State. Whatever the effect of the audit by the court in a case represented to be a State case, it would have no effect if represented to be the case of one not a stranger. The argument that the representation had no operation beyond the auditor general is unsound. Certain correlative and succeeding facts were, to the knowledge and within the actual experience of respondent, necessary to procure money to be transferred from the State treasury to his pocket. The initial fact determined the succession and the correlation. If the initial fact did not exist, but was represented as existing, and the succeeding facts came into existence because of such representation, respondent cannot be heard to deny the relation of cause and effect.

It is said that the action of the circuit court for the county of Wayne in allowing the account was in effect a judgment, and that the collection of a judgment, although such judgment was procured by false testimony, is not, within the meaning of the law, obtaining money by a

false pretense; that the judgment is itself a verity, and conclusive as to succeeding events. It has never been held by this court that the approval by the circuit court of such a claim is a judgment. In *Locke* v. *Wayne Circuit Judge*, 62 Mich. 408, it was held competent for the legislature to impose upon the court the duty of auditing accounts against the State. In *Lachance* v. *Auditor General*, 77 Mich. 563, it was held that neither any State officer nor this court has power to substitute his or our judgment for that of the auditing authority, acting on matters legally referred to that person or body; that as to allowances lawfully made by proper bodies or persons, the duty of the auditor general is the ministerial one of issuing the proper warrant. Both of these cases were mandamus cases. In *Auditor General* v. *Calhoun Circuit Judge*, 101 Mich. 212, the proceedings in and order of the circuit court allowing a coroner's account were brought here by writ of certiorari for review. It was held that, unless there had been some illegal claim allowed, the finding could not be disturbed. In *Re Toepel*, 139 Mich. 85, the question was whether the proceedings in court allowing a coroner's account were so far judicial proceedings and were proceedings so depending in court that a conviction as for a contempt for presenting and securing the allowance of a false account, supported by a false certificate of the coroner, could be sustained. Reliance is placed by counsel for respondent upon the case of *Com.* v. *Harkins*, 128 Mass. 79. It appeared in that case that the respondent, who was plaintiff in a suit against the city of Lynn, had so falsely imposed upon the law officer of the city, and through him upon the governing body, as to induce a belief that a certain physical condition of said plaintiff was the result of an injury received on and on account of a defective street, and to secure a judgment by consent against the city, which was paid. Later he was tried for securing the money under false pretenses. It was held by a majority of the court that—

142 MICH.—35.

"To hold that the statute which punishes criminally the obtaining of property by false pretenses extends to the case of a payment made by a judgment debtor in satisfaction of a judgment, when the evidence only shows that the false pretenses were used to obtain a judgment as one step towards obtaining the money, would practically make all civil actions for the recovery of damages liable in such cases to revision in the criminal courts, and subject the judgment creditor to prosecution criminally for collecting a valid judgment, whether the same was paid in money or satisfied by a levy on property."

Three of the justices (the court had seven members) dissented from the views of the majority. As has been said, however, there is not in this case the fact of a judgment in favor of respondent and against the State. There has been rather an audit of the account. The case at bar is in its facts much like those of *Com.* v. *Mulrey*, 170 Mass. 103; *State* v. *Lynn*, 3 Pennewill (Del.), 316; *Reg.* v. *Cooke*, 1 Foster & Fin. 64; *People* v. *Court of Oyer & Terminer*, 83 N. Y. 436; *People* v. *Luttermoser*, 122 Mich. 562; *Reg.* v. *Lee*, 9 Cox's Crim. Cas. 460; *State* v. *Stewart*, 9 N. Dak. 409.

In *Com.* v. *Mulrey* the false pretenses alleged were a series of representations extending from March, 1896, through January, 1897, that one Finneran had furnished the city of Boston specified numbers of wagons, horses, and men, and that the city owed him stated sums of money for them. Mulrey was teaming clerk in the paving division of the street department of the city. It was his business to make returns, from reports of foremen, of horses, wagons, and drivers employed, and of the amounts due for them. These returns, it is alleged, when duly approved by certain other agents and employés of said city of Boston, were presented to the treasurer of the city, and were paid by him. The false pretenses alleged consisted of representing false returns to be true. It was objected that the city appeared to have paid its money on the strength of the approval of the accounts by other agents, and not on the strength of the defendant's false entries. It is said in the opinion:

"The plain meaning of the indictment is that the approval, so far as amounts were concerned, followed, and was expected and intended by the defendants to follow, as of course upon Mulrey's statement in the return.   *   *   *

"The whole machinery was set in motion, as it was intended to be, by the false return, which deceived the superintendent and auditor into approval, and induced the auditor to draw upon the treasurer, and it was enabled to produce its effect by the demand of payment.   The result, therefore, properly was attributed to the defendants' acts which began and ended the fraud."

In *State* v. *Lynn* the indictment charged that respondent, intending to cheat and defraud the receiver of taxes and county treasurer of a county, knowingly and falsely pretended to the county comptroller of said county that certain work and labor had been done by a certain person upon bridges in said county, for which that person was entitled to be paid, when in fact no such work and labor had been done; that the pretense consisted of a false bill, which was set out in the information, and that by that false pretense defendant procured the approval of the bill by the county comptroller; that he then procured the approval by the levy court and obtained a warrant upon the receiver of taxes and county treasurer, commanding him to pay to the person named or bearer the sum of $56; that defendant received the warrant into his possession, indorsed it with his own name, and procured the same to be paid out of the funds, cash, and money of the said county treasurer.   As a matter of fact, the moneys of the county were on deposit in a certain bank, and the money was paid by another bank to defendant, the warrant then passing through the clearing house to the bank of deposit.   The court, in the charge to the jury, commenting upon and approving the opinion in *People* v. *Genet,* 19 Hun ( N. Y.), 91, and the same case, entitled in the court of appeals, *People* v. *Court of Oyer & Terminer,* 83 N. Y. 436, said:

"So that, it may be safely affirmed as a principle of law, based upon common sense, founded in reason, and supported by authority, that a false pretense which has

ultimately accomplished its purpose of fraudulently obtaining money or other property will follow and taint with fraud every step in the transaction from its inception to its conclusion, however circuitous its route, or however many agencies it may use."

In *State* v. *Stewart* defendant was charged with having fraudulently obtained money from Sargent county by means of a false, forged, and fictitious instrument, presented and used by him as evidencing an indebtedness of the county to him for the destruction of gophers. Among other contentions was the one that, inasmuch as the false certificate was presented and delivered to the county auditor by the defendant and a warrant was received from that officer on the county treasurer, the indictment itself showed that the defendant did not receive money by aid of the false pretenses as charged, but did receive property, to wit, the warrant of the auditor, directing the treasurer to pay the money, and that for that reason the indictment was bad. It was held:

"A sufficient answer to the objection   *   *   *   is that the defendant is not charged with obtaining property from the county auditor, or money from the county treasurer, as individuals, but is charged with obtaining money from Sargent county, by aid of the false certificate in question; and the allegations of the indictment that the certificate was presented to the auditor, that in reliance thereon the latter issued his warrant on the treasurer, and that the treasurer paid the money to the defendant in reliance on the warrant, merely embrace the steps by which the defendant fraudulently obtained the money from the county. The ultimate fact is the obtaining of the money from Sargent county. That is charged, and also the exact manner by which it was obtained."

Respondent is charged with having procured to be paid to him the money of the State. The venue is laid in the city of Detroit, in which city began the chain of circumstances intended to secure, and which did eventually secure, the payment of the money to him in that city. The rule as to venue is thus stated in 1 McClain on Criminal Law, § 696:

"The general proposition as to the venue is that it should be laid where the property is obtained by the false pretenses; and if the criminal obtains money in one county or State and takes it with him into another, he is not to be prosecuted in the latter. It is the county or State in which the property is obtained, and not the one in which the pretenses are made, that fixes the venue; for the offense is not complete until the obtaining of the property."

The decisions are not entirely in harmony, one or two of the English cases being much out of line. An examination of a considerable number of cases leads to the conclusion that in most of those in which the place of actual, manual obtaining of the property is not held controlling of jurisdiction, and delivery to an agent, as to a common carrier, is the delivery proved and relied upon, the rule stated is not disputed, but, and for the purpose of sustaining jurisdiction, is really affirmed; the delivery of the property proven being found to be a delivery to the accused at the time and place alleged. See, upon this subject, *Reg.* v. *Holmes*, L. R. 12 Q. B. Div. 23; *Reg.* v. *Cooke*, 1 Foster & Fin. 64; *Com.* v. *Schmunk*, 207 Pa. 544; *Com.* v. *Karpowski*, 167 Pa. 225; *State* v. *House*, 55 Iowa, 466; *Connor* v. *State*, 29 Fla. 455, 475; *State* v. *Shaeffer*, 89 Mo. 271; *Stewart* v. *Jessup*, 51 Ind. 413; *Norris* v. *State*, 25 Ohio St. 217; *Graham* v. *People*, 181 Ill. 477 (47 L. R. A. 731); *Com.* v. *Wood*, 142 Mass. 459; *State* v. *Lichliter*, 95 Mo. 402; *Bates* v. *State*, 124 Wis. 612.

A number of exceptions and assigned errors are based upon rulings admitting testimony. The pretense, charged in the information to have been false and effective, is the one that Josephine Summers "was a stranger not belonging to this State." This fact is, in the certificate which respondent indorsed upon his account, asserted, and was necessary to be asserted to create a State liability. The falseness of the assertion, it may be said, was, before the case went to the jury, confessed. In his opening statement to the jury, one of respondent's counsel said:

"The sole issue in this case being (of course, this is the

issue in one sense; we do not care anything about that,
though, where Mrs. Summers lived; care nothing about
that) did John T. Hoffmann know at the time he sent in
this bill to the State—did John T. Hoffmann know—that
this woman was not a stranger, but was a resident of the
city? And, if he did know it, did he designedly and in-
tentionally seek to defraud the State of Michigan in pay-
ing him something which he was not entitled to? That
is all there is to this case in a nutshell. There are a thou-
sand different things, but that is the meat of the case.
Did he know, and with that knowledge, did he intention-
ally and designedly defraud the State of Michigan out of
the sum of $56.34? That is the case, gentlemen."

In the argument made to the jury, the same attorney
used the following language:

"Now, what is the Summers case? I am not going to
stand before this jury and spend any time upon the propo-
sition whether or not Mrs. Summers was a resident of
this State. Of course, that is one of the essential things to
be found by the jury. I am not going to stand before
a jury of 12 men and say that she was not. Of course,
I am not going to do anything of the kind. I am satisfied
from this evidence—and there might be a legal question
by what is meant by resident, and all those things. But
I am satisfied from this evidence that you are, and that
you will have no difficulty when you get into the jury-
room about that. We do not ask you to inquire about
that matter, although it is up to you on your oaths—that
Mrs. Summers actually lived in the city of Detroit for a
period of from six to eight years in the city of Detroit be-
fore the unfortunate woman met the injury that resulted
in her death. We are not going to spend any time on
that proposition. Although that is one of the elements in
this case, was or was she not a stranger not belonging to
the State? If she was actually a resident here you will
have to spend no time on that proposition. I do not ask
you to. I could not consistently ask 12 men who had the
same understanding that I have, and his honor has, and
everybody has, upon that proposition under this evidence
in the case. And it does not amount to very much. She
did live, according to this evidence, for a good many
years, at the place where she was shot, and had lived at
some other place which has been designated here by the
evidence of one or two witnesses at another place previous

to that. The question in this case is this, gentlemen—the main question in the case or the main two things: Did John T. Hoffmann know where she lived? And proposition No. 2 is that, if he had that knowledge, did he designedly intend to defraud the State in sending in that claim? Of course, gentlemen of the jury, if she was actually a resident of the city of Detroit, and he represented that she was not, that was a false representation. But he is not bound by that unless he knew at the time that there was a false representation."

In view of these statements, of the evidence produced, and of the verdict rendered, further discussion proceeds upon the assumption that certain elements of the offense charged are made out. These are (1) that respondent made the pretense charged, (2) that it was false, and (3) that by reason thereof he obtained the sum of money stated. Of the two principal issues of fact remaining, one involves the knowledge of the respondent that his certificate was false in respect to the residence of Mrs. Summers; the other, the intention of respondent to cheat and defraud the State. Counsel for respondent did not at the trial, and do not now, concede that, if respondent knowingly made a false certificate as to the residence of Mrs. Summers, the intent to cheat and defraud the State would be made out. This is made plain when the following requests to charge, preferred by respondent, are considered:

"15. * * * If, under the evidence and the court's instructions, you do find from the evidence beyond all reasonable doubt both the falsity of his statement and his knowledge of it at the time he made the statement, then you will pass on to the next proposition. Did Hoffmann, at the time he made and forwarded the statement to the auditor general, intentionally design to cheat and defraud the State?

"16. The law presumes that he did not intentionally design to cheat and defraud the State, although his statement may be found by you to be false, and although you may find that he knew it was false. Before you can find that he intended to cheat and defraud the State, you must each one of you be satisfied beyond all reasonable doubt from the evidence, and that only, that he actually did so intend."

The knowledge and belief of respondent and his purpose and intent were each of them a state or condition of mind, to be inferred from circumstances. Stated as a general proposition, both knowledge and belief and intent may be proven by evidence of facts and circumstances fairly leading to the conclusions asserted, and fairly negativing other reasonable inferences. The case is in some respects a singular one. It might seem at first blush that if it was satisfactorily established that the pretense that Mrs. Summers was a stranger was false, and that respondent had neither knowledge nor belief warranting the certificate he made, if he used the pretense to obtain money from the State, his fraudulent design would be, by reasonable inference, made out. But it is apparent that the forceful argument might be made that if the account was a correct one, and if the respondent was entitled to be paid the sum which he obtained, either by the State or by the county, no design to cheat should be inferred. Rather, the inference should be drawn that in some unexplained way, in making out and presenting bills in a large number of cases, a mistake had been made. In a case where every element of the crime charged must be made out beyond a reasonable doubt, it might be doubted whether one had committed the crime of obtaining money with intent to cheat and defraud, if he had not in fact profited by his act. In attempting, with respect to both these issues, to close the door to all reasonable inferences except of guilt, the prosecution was permitted, it is claimed, to introduce, and the jury to consider, incompetent and immaterial testimony.

(a) It was shown that the name of Mrs. Summers and her place of business appeared in directories of the city for certain years, and that these directories were a part of the official library of respondent. A witness read the entries from the directories to the jury. This evidence was proper, in connection with other evidence showing that Mrs. Summers had for years lived and done business at the place indicated in the directories. If respondent con-

sulted the directories, he obtained information opposed to the fact certified by him. If he did not consult them, but in the face of the testimony given at the inquest pursued devious and unpromising avenues of information, a reasonable ground for inference affecting both his purpose and belief would be afforded. The directories were in evidence. The fact that a witness read from them, it not being claimed that a false reading was made, does not constitute error. City directories were received in evidence, and their contents placed before the jury, in respect of some of the so-called collateral cases hereinafter referred to. Counsel for respondent properly enough contended for and properly obtained a ruling to the effect that the duty imposed upon the coroner in such cases was to certify residence according to his best information and belief. The directories did not prove that the persons named were residents or were not strangers. They were, however, commonly used means of information. It appeared from them that these persons were residents and not strangers. Other evidence tended to prove that the directories were in fact correct. There was no error committed in admitting them in evidence, nor can it be said that counsel for the people, in opening or in closing the case to the jury, made, in this connection, improper statements or unfair comments. In the charge to the jury, no direct reference was made to the directories, nor was any requested.

(b) The prosecution offered in evidence some 40 bills or vouchers of the defendant, upon blanks similar to the Summers blank, the vouchers being similar to the Summers vouchers, for alleged fees and expenses in alleged inquests held on the bodies of the persons mentioned in said bills or vouchers, which vouchers were signed by and in the handwriting of the respondent, Hoffmann, and upon each of which was a similar certificate of the respondent, John T. Hoffmann to the one in the Summers case, and each approved by the Wayne circuit court. In all of these bills similar charges were made—60 miles travel for witnesses and $30 for post mortem examination. The major

portion of the other bills was for the amount of $56.34, and some for a greater amount. The proof showed that all of these other bills were paid by the State. The prosecution then produced some 50 or 60 witnesses, who gave testimony tending to show that a large number of the persons mentioned in these bills, among them being Anthony Reske, Stephen Elliott, Margaret Freda, Scott Hitch, and William McGonegal, were residents of this State, and had lived in Detroit for many years. Over objection and exception the prosecution was permitted to show by these witnesses that in most instances the jury were not sworn over the body of the deceased; that the witnesses did not receive the amounts charged for in the bills; that they received nothing in any of the cases for mileage; that in many of the cases the witnesses charged for were not sworn at all, but simply signed an unsworn statement; that in some cases no inquests were held at all; that in a great majority of the cases no autopsy was had, and that none was necessary. The witness Hinchman identified the files and the coroner's records in the 30 or 40 collateral cases introduced in evidence, the record in each of said cases being signed by John T. Hoffmann, respondent (his signature being identified by the witness), such records being made on printed blanks, part of the record being in print and part in writing, bound in book form, a part of which record states that the coroner, in view of the dead body, administered to the jurors the oath required by the statute; that the following named witnesses (naming them) were sworn and testified at the inquest; and that the testimony of these witnesses was reduced to writing, by and under the direction and in the presence of the respondent coroner, and after being read over to each of said witnesses was signed by them respectively; that thereupon the jurors, upon an inspection of the dead body of said deceased person, and after hearing the testimony of the witnesses, and making all needful inquiries, did render and deliver to the said coroner their inquisition or verdict, signed by each of said jurors, in words as follows: (Then

follows the verdict, giving respectively the various causes of death in the various cases, among them being uremic poisoning, cardiac insufficiency, valvular disease of the heart, and senility.) The record in each of the cases concludes then with the attestation of the respondent coroner. And these records were admitted over the objection of the respondent that they are incompetent, immaterial, and irrelevant to the issue in the case, and exception taken. The witness Hinchman then further testified that the facts are not as stated in the record, and that, excepting in 2 or 3 of the 30 or 40 collateral cases mentioned, the persons whose names appear in the record as having been witnesses at an inquest, never gave sworn testimony before the coroner and a jury, and that in place thereof unsworn statements were procured from them, either at their homes or in the office of the coroner by the coroner's clerk, the witness Hinchman. Evidence was admitted tending to prove that the witnesses in the Summers case did not travel the miles charged for, did not receive pay for mileage, and that the post mortem fee was not paid by respondent to any one.

It cannot be doubted that all this evidence was prejudicial to respondent. He was a public officer. It tended to prove that he had been engaged, under cover of his official position and in the performance, apparently, of official duties, in robbing the State by means or devices similar to those charged to have been employed by him in the Summers case. It afforded ground to support the necessary inferences of respondent's guilt of the crime charged. It is said by counsel that such similar conduct can be shown, in this class of cases, only where defendant has admitted it. Defendant has admitted the acts in the case at bar and in the collateral cases. They are shown by his official records. The fact which distinguishes the case at bar from some of those cited in the briefs is the one that the acts of respondent were proper acts. The presentation to the auditor general of an itemized account with certificates attached is the proper method of render-

ing a proper account against the State. No number of repetitions of the act, within a reasonable number, would import bad faith in a particular case. But where it is proved that an account, regular and proper in form, is false in fact, not only as to the party to whom made out and presented, but in amount, and that the responsible person profited by reason of the false representations, and it is further proved that the same person had theretofore profited repeatedly by the same false means, there is established, in fact, basis for the inference of guilty knowledge and intent in the particular case. Is there any legal objection to evidence which is in fact so convincing?

In *Queen* v. *Francis*, L. R. 2 Cr. Cas. 128, the question reserved was whether evidence of the kind we are considering was properly received for the purpose of proving guilty knowledge. Francis was arrested while seeking an advance from a pawnbroker of £11 sterling upon what he represented to be a diamond ring. The ring was produced in court, and experts pronounced the stones to be crystals, and not diamonds, and worth no more than 6 pence each. The defense was that the prisoner did not know the stones to be false, but was employed by another to pawn the ring. To prove guilty knowledge, it was shown that the prisoner had shortly before offered other false articles to other pawnbrokers—a gold chain and a cluster ring. In one case he obtained, and in the other did not obtain, an advance upon the articles. At the trial, because the cases relied upon by the prosecution were all cases either of forgery or uttering counterfeit coin, a verdict was taken subject to decision of the point reserved. It was held (Coleridge, C. J., delivering the opinion) that the evidence was properly admitted, and the following is the rule stated:

"It seems clear upon principle that when the fact of the prisoner having done the thing charged is proved, and the only remaining question is whether at the time he did it he had guilty knowledge of the quality of his act or acted under a mistake, evidence of the class received

must be admissible. It tends to show that he was pursuing a course of similar acts, and thereby it raises a presumption that he was not acting under a mistake. It is not conclusive, for a man may be many times under a similar mistake, or may be many times the dupe of another; but it is less likely he should be so often than once, and every circumstance which shows he was not under a mistake on any of these occasions strengthens the presumption that he was not on the last, and this is amply borne out by authority."

I am not able to distinguish the cases. In *State* v. *Brady*, 100 Iowa, 191 (36 L. R. A. 693), the defendant was acting overseer of the poor for a certain county. He was authorized by the board of supervisors to furnish transportation to indigent poor persons found within his jurisdiction, in order that they might be carried to the places of their respective legal settlements. For the sums paid by him in procuring this transportation he would from time to time file an account against the county with the county auditor, who was authorized to issue warrants for the amounts of claims so filed. During the year he filed upwards of 500 such claims, aggregating $1,400 in amount. Upon his trial for obtaining a warrant by the false pretenses that he had furnished transportation to a woman and her children, the court permitted evidence of all of the claims filed by him during the year, and, by their records, of all the ticket sales of certain railroad companies made in the city of Ottumwa during the year. There was other evidence to support the allegations of the indictment. The evidence, it was held, was properly admitted, the opinion containing the following:

"It seems to us that the evidence was also admissible for the purpose of proving a systematic scheme or plan on the part of the defendant to cheat and defraud the county, thus negativing the idea that the presentation of the claim in question was accidental, or through oversight, or mistake. * * * The jury may well have found, from the evidence complained of, that the filing of the claim, and the receipt of the warrant charged in the indictment, was a part of a plan or scheme adopted by the defendant to

cheat and rob the county. For this purpose, as well as for the purpose of establishing the defendant's knowledge of the falsity of the claim, the evidence was admissible."↱

The case at bar is one in which the rule above stated may be safely applied, and, the independent testimony being such as to leave no doubt of the making of the pretenses by respondent, of the falsity of the pretenses, nor of the resulting benefit to himself, the evidence in question was admissible, not only to prove a fraudulent intent, but also to prove knowledge of the falsity of the pretense used. In principle, the case is not to be distinguished upon the subject of the element of guilty knowledge from such as involve the uttering of forged or counterfeit paper. It is said, however, that the evidence with relation to the collateral cases does not show that respondent had in those matters knowledge that the persons were not strangers; that—

" Whatever might be said of their evidential value, had it been proven that he falsely certified these cases with guilty knowledge, certainly it cannot be said that with the fact of guilty knowledge left out of them, they have any evidential value on the question of guilty knowledge in the main case."

The reasoning is not satisfying. In each case the certificate was made and was false. In each respondent was either mistaken, was deceived, or was dishonest. In most, if not all, of them he collected more than he paid out and more than was right. It is charged, in the last case, that he was dishonest. As evidence tending to support the inference of dishonesty, the repeated similar false representations and the results of them were admitted. As is said in *Queen* v. *Francis*, he may have been each time deceived or mistaken. It is not probable.

(*c*) It is complained that error was committed in the manner of proving or attempting to prove the falsity of representations in some of the collateral cases. A witness testified, over objection, that McGonegal was for about five years member of the Engineers' Union in Detroit.

This evidence was admissible for the same reason that the directories were admissible. Another witness, Peter Harris, one of those named as an inquest witness in the matter of Scott Hitch, testified that at the coroner's office, at the time his statement or testimony in that matter was given, he informed the person who was there, and who interrogated him and took down the statement, of facts showing that said Hitch was not a stranger, and did not give the information appearing in his signed statement. The witness stated that but one white man was present at the time, and that man was not respondent. Motion to strike out this testimony was denied. It has been already stated, but may be repeated, that the witness Hinchman, the coroner's clerk, testified, and that is the only information upon the subject, that when respondent came to make out his bills or statements to either the county or the State he had before him, as part of the files in each case, the statements of witnesses and others which he (Hinchman) had procured, either at the inquest examination, or, as in the Summers case, in some other way. In the matter of Scott Hitch, these files were produced at the argument in this court. There are six sheets of paper attached together. On the first is the certificate of Dr. Sanderson to the fact of a post mortem examination which discovered that said Hitch died because of hemorrhage of the lungs resulting from tuberculosis. There follow written statements of four persons, signed. The statement signed "Peter Harris" is to this effect:

"Knew Hitch in his lifetime. He always lived in Amherstburg, and only came here in March. I was just coming from home when I noticed him bleeding, and I assisted in putting him in the ambulance."

In none of the statements is there anything indicating the necessity for an inquest. The point made is that these statements, not made in the presence of respondent, afforded him no information, and cannot be used to show his guilty knowledge. Counsel lose sight of the fact that,

unless there was an inquest in the matter of Scott Hitch, *any* demand for fees in that matter was a fraudulent demand. The law does not contemplate that inquests shall be held by coroners' clerks.

(*d*) The statements of Dr. Case and of Dr. Stone, already referred to, appearing in the files in the Summers case: Dr. Stone was produced as a witness by the people. In an affidavit for a continuance, respondent had stated, among other things:

"Deponent further says that one Ida Stone, of the province of Ontario, is a material and necessary witness in his behalf in the above entitled cause; that he has fully and fairly stated to his attorneys and counsel what he expects to prove by the said Ida Stone, and that he has been advised by his attorneys and counsel that the said Ida Stone is a material and necessary witness to him, without whose testimony he cannot safely proceed to a trial in the above entitled cause, and that he has a good defense on the merits thereof; that respondent expects to prove by the said Ida Stone, among other things, that the claim, in said information alleged to be false and fraudulent, was just, and that the said Mrs. Josephine Summers, in said information mentioned, was a stranger not belonging to the State of Michigan, and that the said Ida Stone so testified at the inquest held on the body of the said Mrs. Josephine Summers, and so stated to this respondent."

Upon producing Dr. Stone in court, the following took place:

"*Mr. Hunt:* Your honor will remember the affidavit of counsel for defense filed on the 10th day of December.

"*Mr. O'Hara:* We object to any statement. There is no necessity for any explanation. We object to any statement in the presence of the jury as to this matter or anything appertaining to it. I don't know what he is to say.

"*The Court:* I don't know that what he is about to say, or is contemplating saying, should not be stated in the presence of the jury.

"*Mr. Wilkins:* I take an exception.

"*Mr. Hunt:* I say, we have produced Ida Stone in view of the affidavit filed by the defense, and have placed her upon the stand here and she can now be interrogated by

the defense in view of the affidavit filed on the 10th of December. We have the affidavit here. (Mr. Hunt hands paper to Court.)

" *Mr. Hunt:* We will waive our examination in the first instance in view of their affidavit, and let them go ahead and examine their witness.

" *Mr. Wilkins:* If they have any testimony to put in, let them proceed, and we will then cross-examine in the regular course.

" *The Court:* Do you accept the waiver?

" *Mr. Wilkins:* We do not.

" *Mr. Hunt:* You will repudiate the witness.

" *Mr. Wilkins:* We take an exception to that statement. We are not obliged to put in any testimony at present, or at such time as the prosecution may designate.

" *The Court:* There is no doubt about that.

" *Mr. Hunt:* In view of their refusal to examine the witness, we will examine her ourselves.

" *Mr. Wilkins:* We refuse to examine at this time. We do not admit that we have any case to meet yet.
* * *

" *The Court:* The prosecution have waived the right to examine the witness. The waiver not being accepted, and the witness now being on the stand, the prosecution may proceed."

Thereupon the witness was examined by the prosecuting attorney, and cross-examined by counsel for respondent. Her statement was offered by the people, received without objection, and read to the jury. The affidavit of respondent, already referred to, was offered in evidence by the people, and, over objection, the prosecuting attorney read from it to the jury that portion already given. Thereupon counsel for respondent read the whole of the affidavit to the jury.

The witness Hinchman was produced by the people, and was without examination turned over to counsel for the defense, who examined him. He testified upon such examination to some facts favorable to respondent. He examined the testimony of the inquest witnesses found in the files in the Summers matter, and, after doing so, stated that while he did not claim that he took down all of

142 MICH.—36.

the testimony given, "because I could not possibly get it all," he got the substance of it as well as he could. He testified that the statements then and there examined by him did contain the substance of what the witnesses stated. He stated further that the signed statements of Dr. Stone and of Dr. Case contained the substance of what they said to him; that he and not respondent procured them. He was asked what he told respondent they said to him, and stated that he told him that Dr. Case said that in her conscious moments Mrs. Summers "frequently mentioned Chicago and wished she had not come to Detroit, for if she had not this thing never would have happened;" that Dr. Stone was there during the talk with Dr. Case; and that he told Mr. Hoffmann of the statement made as one coming from both Dr. Case and Dr. Stone. Following is a portion of the cross-examination of this witness, including that which is complained about:

"*Q.* Were those statements read to the jury?

"*A.* I don't believe they were; no, sir.

"*Q.* Why were they not read to the jury?

"*A.* It was not necessary. It had no bearing on the cause of her death. For that reason they were not read to the jury. * * *

"*Q.* Why did you get those statements as bearing on what? * * *

"*A.* As long as it was a State case, to have it so.

"*Q.* You got those statements for the express purpose of making a State case at the time, didn't you? * * *

"*A.* I did; yes, sir.

"*Q.* Is that correct?

"*A.* Yes, sir. * * *

"*Q.* What reason was there for the use of these statements which you claim to have procured, when at the inquest there were persons who testified, as it appears in your own handwriting, that they knew Mrs. Summers and lived near her? * * *

"*A.* What reason there was for these two statements?

"*Q.* Yes, when there were persons who at the inquest stated that they lived near her and knew the woman? * * *

"*A.* The reason of those two statements was for the

purpose of making a State case; no question about that.

"*Q.* Notwithstanding the fact that there were persons who knew the woman, lived near her, and who testified at the inquest?

"*A.* Why, certainly, if she had given him those statements, to Case, in his hearing.

"*Q.* Did you attempt to get any knowledge from these people who stated there at that time in your presence—

"*A.* I don't know anything about it. * * * I knew nothing of these witnesses until they came in the court-room.

"*Q.* You heard at the inquest that she lived at 446 Sixth street?

"*A.* Certainly.

"*Q.* Did you go up there and inquire how long she lived there?

"*A.* I did not. It was not my place. It was not my duty.

"*Q.* Do you know whether Hoffmann ever went up there to inquire?

"*A.* That I don't know. I am not the coroner.

"*Q.* Do you know whether he ever sent anybody up there to inquire?

"*A.* I don't know.

"*Q.* Did you ever go up to see Mrs. Maggie Mead before this bill was made out?

"*A.* I did not.

"*Q.* After she had testified that she knew Mrs. Summers in her lifetime?

"*A.* I did not.

"*Q.* Did you ever attempt to get any information from Bert High as to how long this woman had lived here?

"*A.* I did not. It was not my place to.

"*Q.* You were simply satisfied to have the two statements of people who say that they didn't know Mrs. Summers, the deceased, before she was brought to the hospital?

"*A.* I was satisfied with them."

It is urged that Hinchman's reasons for securing the written statements of Dr. Stone and of Dr. Case should have been excluded, because it does not appear that he procured the statements by understanding with or direction from respondent; that from the testimony the jury might infer that Hinchman went to the hospital to get the

statements to make a State case out of what possibly should not be a State case; and that he was seeking to increase the coroner's fees by "graft," with the possible inference that respondent was concerned in the "graft." It is not easy to discover how it was prejudicial error to permit Hinchman to state the only possible and the self-evident reason for obtaining the statements of these doctors. The reason was no more evident after he had stated it than it was before. The uncomfortable inferences which might be drawn from what Hinchman did, which it was certainly competent for the defense to show, are not rendered more uncomfortable by the statement of the witness of his purpose. Respondent knew that neither Dr. Case nor Dr. Stone had testified at the inquest. He did know, independently of the statements taken by Hinchman, what the inquest witnesses did say. As a consequence, he knew that some one—himself or Hinchman—had in some way, at some other time and place, procured the statements of the physicians. The purpose of Hinchman was, presumably, just as apparent to Hoffmann as it is to one who reads the history of the transaction. Further, Dr. Stone's recollection was that it was respondent, and not Hinchman, who obtained her statement.

It is urged, also, that it was error to receive the testimony of Dr. Stone as to what was in fact said by her, its tendency being to contradict her signed statement, and to contradict Hinchman, the conversation not having occurred in presence of Mr. Hoffmann or being shown to have been reported to him; that whatever she may have heard concerning the residence of Mrs. Summers was hearsay. It was not objected below, and is not here, that the people had made Hinchman their witness and could not be allowed to impeach him by the testimony of contradicting witnesses. Dr. Stone was, at the conclusion of Hinchman's examination, again called to the witness stand and examined on the part of the people. During her first examination, she was asked, referring to Mrs. Summers:

" *Q.* Do you know where she lived?

" *Mr. Wilkins:* I object to that, unless it is of her own knowledge.

" *The Court:* It necessarily means that. It may be answered.

"*A.* I didn't see the place—

" *Q.* Did you know or hear of it?

"*A.* Yes, I heard of it.

" *Mr. Wilkins:* As to hearing of it, I object to that.

" *Mr. Hunt:* In view of their affidavit, I want your honor to read it again, if you have any question about it. The latter part of that page (handing the court paper).

" *The Court:* The pending question asked what was told the witness as to the place of residence of the deceased.

" *Mr. Hunt:* Yes.

" *Mr. Wurzer:* Yes, I want to get at what her knowledge was in relation to the alleged statement to the effect that this woman was a stranger. * * *

" *The Court:* I think you better test her knowledge, Mr. Wurzer.

" *Q.* Were the circumstances surrounding the shooting and the place where this woman was shot discussed in your presence around the hospital?

"*A.* Yes, it was.

" *Q.* And that was quite a sensational case at that time, was it not, a sensational shooting?

"*A.* Yes.

" *Q.* Very mysterious?

"*A.* Yes.

" *Q.* And was discussed?

"*A.* Yes.

" *Q.* Did you have any sort of knowledge whatever that Mrs. Summers was a stranger, not belonging to the State of Michigan?

" *Mr. O'Hara:* We object to that, as to what knowledge she may have had, or what was said.

" *The Court:* Objection overruled. Exception.

" *Q.* Did you have any knowledge at all to the effect that Mrs. Summers was a stranger not residing or not belonging to the State of Michigan?

"*A.* No, I had no such knowledge as that; that she was not belonging to the State of Michigan. I knew that she kept a store. I was told that she kept a store—

" *Mr. Wilkins:* What you were told the court has ruled is not admissible.

"*Q.* You knew, contrary to that, that she was not a stranger, that she lived here?

"*Mr. Wilkins:* That is what she understood. I object to that.

"*The Court:* She may state. (Exception.)

"*Q.* Wasn't it discussed around the house there, and around the hospital, with reference to the shooting?

"*Mr. Wilkins:* I object to that as incompetent and improper.

"*The Court:* Doesn't it bear upon the opportunity the respondent had for knowing what people claimed as to the residence of the deceased?

"*Mr. Wilkins:* Discussed? No, your honor. * * *

"*Mr. Hunt:* Mr. Hoffmann's attitude with reference to that is proper, and what he might have learned, had he gone there, is proper, to go to this jury.

"*The Court:* The information this woman had as to where this woman resided; I think you may have the answer.

"*A.* I think so.

"*Q.* And quite a good deal, wasn't it?

"*A.* I think so.

"*Q.* Did you ever testify at any inquest concerning this woman or the shooting?

"*A.* No, I signed a paper. That does not include the testimony in the inquest, does it?

"*Q.* Yes; I'll get to that in a moment. Did you go to some place and testify in open court to anything?

"*A.* No, I never did.

"*Q.* Did you ever receive any witness fees or mileage fees for going to court and testifying?

"*A.* No, I never did.

"*Q.* I show you Exhibit 172, and ask you whether that is a statement that you signed and whether that is your signature.

"*A.* That is my signature. I think that is the statement I signed.

"*Q.* Who came and got that statement from you?

"*A.* I beg pardon; I didn't hear your question.

"*Q.* Where did you sign that statement?

"*A.* I signed it at Emergency Hospital.

"*Q.* About when, do you know?

"*A.* I can't give the date.

"*Q.* Do you know Mr. Coroner Hoffmann?

"*A.* Yes, I know Coroner Hoffmann.

"*Q.* Was he around there at that time?

" *A.* Now, I can't say for certain whether it was Coroner Hoffmann or—I believe he had an assistant, Mr. Hinchman. I think I knew them both. They used to come to the hospital, and each one. But which one asked me to sign that, I can't say; I have forgotten.

"*Q.* Was Mr. Hoffmann around there at the time this woman died ?

"*A.* I don't know.

"*Q.* Can you tell whether it was Mr. Hoffmann or Mr. Hinchman that came and got this statement from you ?

"*A.* I think it was Mr. Hoffmann, but I am not sure.

"*Q.* Was the statement written ready at that time or not ?

"*A.* It was written before I saw it, and I was asked to sign it.

"*Q.* Had you made a statement to him previous to that, to furnish him the information from which he wrote out the statement ?

"*Mr. O'Hara:* Statement to whom ?

"*Mr. Wurzer:* Hoffmann. I am talking about Hoffmann.

"*A.* I don't remember ever having made any statement to him.

"*Q.* This particular statement was already written out, and you were asked to sign it ?

"*A.* Yes.

"*Q.* Were the circumstances concerning this case discussed there at that time outside of the signing of the statement ?

"*A.* No, I think not. I simply signed it and let it go at that.

"*Q.* Did you read it over at that time before you signed it ?

"*A.* I am sure I read it over because I always do.

"*Q.* There is a statement here at the bottom of it, ' She was a stranger.' What did you mean by that ?

"*Mr. Wilkins:* I object to what she means. She can't interpret the statement.

"*Mr. Wurzer:* She can interpret her own statement.

"*Mr. Wilkins:* I object to it. It is not shown that Hoffmann was the man who got that statement.

"*The Court:* I think it is proper to show all attending facts and circumstances surrounding the signing of this paper by the witness.

"*Mr. Wilkins:* Hoffmann can't be bound by what statements she may have made to Hinchman.

"*The Court:* You may show all the attending facts occurring at the time this statement was signed by her.

"*Q.* To the best of your knowledge you can't say at that time that it was Hoffmann who was there and got that statement signed by you?

"*A.* To my best knowledge, it was Hoffmann.

"*Q.* Not Mr. Hinchman?

"*A.* To the best of my knowledge.

"*Q.* What was said there at that time, if you can remember?

"*A.* I was simply asked to sign the statement, and I did it.

"*Q.* Is that all that was said?

"*A.* That is all I can remember that was said and done.

"*Q.* You gave him no information?

"*A.* I gave him no information.

"*Q.* From which he wrote out that statement beforehand?

"*A.* No, I gave him no information that I know of.

"*Q.* He just brought to you that paper, and asked you to sign it, and that is all there was to it?

"*A.* Yes.

"*Q.* Did you ever tell Hoffmann that Mrs. Summers was a stranger, not belonging to Michigan?

"*Mr. O'Hara:* We object to that as leading. We don't claim she ever did.

"*The Court:* Objection overruled. (Exception.)

"*A.* No, I never said she was not belonging to the State of Michigan.

"*Q.* Do you know who else was ever there at the time, if any one.

"*A.* When the statement was signed?

"*Q.* Yes.

"*A.* I think there was no person in the room but the coroner and myself.

"*Q.* Were you asked by Mr. Coroner Hoffmann there at that time whether you had any knowledge to the effect that this woman was a stranger not belonging to the State of Michigan?

"*A.* No.

"*Q.* Or whether she had any residence in the city of Detroit?

"*A.* No, I don't remember anything of it.

"*Mr. Wurzer:* I think, your honor, that it would be competent to ask her now what is meant by the phrase here, 'She was a stranger.'

"*A.* I think I meant probably what .is there.    \*    \*    \*

" *The Court:* The question pending here is, whether the witness' understanding of the words, 'She was a stranger,' is competent.   This statement was brought to her already prepared, and she signed it, nothing being said about the contents at all.

" *Mr. Wurzer:* I will put the question in this form, if your honor please.   Why did you sign this statement shown here containing the words, 'She was a stranger,' in view of the fact that you knew she was not a stranger not belonging to the State of Michigan ?

" *Mr. Wilkins:* I object to that, why she signed it.

" *The Court:* It may be answered.   (Exception.)

"*A.* I meant that she was a stranger to me, and we could get but very little from her."

When recalled, Dr. Stone gave testimony tending to show that she remembered the circumstances attending the signing of the statement very well; that the testimony of Hinchman that witness and Dr. Case were together in the same room when the statements were signed was untrue; that there was nothing said in her presence and in the presence of Mr. Hinchman with reference to the woman having stated in her delirium that she came from Chicago; that witness never heard the woman say anything of that kind in her delirium; that she had no recollection of hearing Dr. Case make any such statement and never heard Dr. Case discussing the matter with Mr. Hinchman at all; that Dr. Case was not in the room when witness signed her statement, and she was not in the room when Dr. Case signed his statement, and did not see him sign it.   She stated on cross-examination that the statement as she signed it, with her interpretation of the statement, was correct.

So much of the testimony and course of the trial has been set out for the purpose of making plain the connection between the testimony of Dr. Stone and that of Mr. Hinchman and the statements in the affidavit of respondent read in evidence.   To the objections made to the explanation given by Dr. Stone of the sense in which she understood the words " She was a stranger," in her statement,

it is answered that her interpretation was in harmony
with the natural and reasonable meaning of the words in
view of the circumstances detailed. Had she stated a
forced, unnatural, or unreasonable interpretation, respond-
ent would have ground for complaint. It is not reversible
error to permit a witness to interpret a writing, when the
interpretation given is the only one the words of the writ-
ing will bear. As to her statements of what was said
and done at Emergency Hospital, it must not be for-
gotten that she had testified that according to her best
recollection it was Hoffmann, and not Hinchman, who
procured her statement. The result may have been to
discredit Hinchman, but that would have been true had
the jury found that Hoffmann did procure the statement.
In view of her statement that it was Hoffmann, the testi-
mony was properly admitted. The objections made to the
reading of the affidavit are seriously debated. It is claimed
on the part of the prosecution that it was receivable
as an admission of respondent, to show that he was
making contradictory defenses and statements, and as
bearing upon his knowledge and intent. Respondent
was not a witness, nor is it apparent from the record that
he was making contradictory defenses or contradictory
statements. The purpose in offering it is plain. It was
to show to the jury that respondent had made certain as-
sertions of facts, and to contrast the assertions so made
with the testimony given by Dr. Stone and by the wit-
ness Hinchman. It was hoped that the contrast would be
unfavorable to respondent, since, if the witnesses were be-
lieved, respondent would be discredited. The language
used by the prosecuting attorney was calculated to accen-
tuate the plain and irreconcilable conflict between the state-
ments of the witness and the affidavit of respondent. If,
however, the conduct and language of the prosecuting at-
torney was not calculated to produce effects other than
those which reason would admit, and if placing the affi-
davit before the jury was proper for any purpose, revers-
ible error will not be found.

Counsel for respondent concede that statements of fact, voluntarily made under oath by the accused, may, when relevant, be proved against him as admissions on his trial. They assert, however, that the portion of the affidavit read by the prosecuting attorney is neither a statement of fact nor relevant; that it is a statement of expectation, and of what respondent hoped to be able to prove by the witness. If the facts expected to be proved by the witness were facts outside the personal knowledge of the affiant, and known to him only by hearsay or belief, it might well be said that the affidavit contains no assertion of facts. Such, however, is not the case. Respondent, as well as the witness, had knowledge of the facts which he asserted the witness would state. At the time the affidavit was made, the respondent stood accused of crime. An issue had been made between the people and himself, involving the knowledge and belief with which he made his certificate. Pending the trial of that issue, this affidavit was made. Its effect is to assert that the relevant and material facts therein stated are true to affiant's own knowledge and that the absent and desired witness will so testify. Counsel have referred us to no case directly in point. It is common practice, in the trial of criminal cases, to show that the accused has made self-serving explanatory statements concerning the circumstances of the offense with which he is charged and his connection therewith, and that such statements were untrue. Such statements are not, in the ordinary sense in which the word is used, though perhaps strictly so, admissions, nor are they confessions. They are sometimes classed as conduct of the accused. In *People* v. *Arnold*, 43 Mich. 303, this court held, CAMPBELL, J., dissenting, that a prisoner's statement in his own defense on a former trial might be given in evidence as part of the people's case and shown to be false. I can see no difference in principle between that case and the one at bar. Much that is said in the dissenting opinion would be without force here. See, also, *People* v. *Prague*, 72 Mich. 178; *People* v. *Eaton*, 59 Mich. 559. Statements

made by an accused person tending to divert suspicion from himself may be proved, and shown to be false. *Com.* v. *Devaney*, 182 Mass. 33; *Com.* v. *Starr*, 86 Mass. 301. In *State* v. *Furgerson*, 162 Mo. 668, 678, it is said:

"Any and all statements shown to have been made by defendant tending to show his connection with the homicide were admissible, however inconsistent they may have been, and regardless of any tendency that they may have had to discredit him as a witness before the jury. Such evidence was not introduced for the purpose of impeaching or discrediting defendant as a witness, but was for the direct purpose of showing that he committed the crime."

So of fabricated and false statements made to account for the possession by the accused of stolen property. *Coleman* v. *People*, 58 N. Y. 555. In *Stewart* v. *People*, 23 Mich. 75, opinion by Mr. Justice COOLEY, it is said:

"The proper test for the admissibility of evidence ought to be, we think, whether it has a tendency to affect belief in the mind of a reasonably cautious person who should receive and weigh it with judicial fairness."

There can be no doubt that if the source of information and the particular information received, as stated by respondent in the affidavit, were as stated, they would tend to prove that respondent had information upon which to base belief that Mrs. Summers was a stranger not belonging to the State of Michigan. That respondent made the affidavit, the assertion, with personal knowledge of the truth or falsity of the matter expected to be sworn to by the witness, and that it was untrue, and, resultantly, the expectation expressed could be realized only if the witness should commit perjury, are facts calculated to raise the belief in the mind of the most cautious person that respondent had no information or belief that Mrs. Summers was a stranger. In connection with the undisputed facts concerning her residence, the statements made by the inquest witnesses, the avenues of information open to respondent which led to the truth, the false assertions made in this affidavit are circumstantial evidence, of the most

convincing nature, that respondent fraudulently certified the account which he presented to the State. No constitutional right of the accused was infringed, and no good reason is asserted for excluding this index of the knowledge and belief attending the making of the certificate. What the prosecuting attorney said upon the occasion should have been left unsaid. The proper time for argument had not arrived. As argument, it was not improper.

As to other objections made at the trial: The testimony of Dr. Smith that he received no pay for making the post mortem examination was, for reasons already stated, admissible. His testimony concerning the reasonableness of a fee of $30 in cases stated by way of hypothesis, was immaterial. It was not, however, prejudicial. It went little, if any, beyond what would have been proper argument, based upon common knowledge. It does not require that an expert shall testify that no post mortem examination was needed in a case like the one of Scott Hitch, nor that one post mortem examination may properly be paid for at a price which would not be earned in another of less difficulty, or requiring less time and skill in its performance. The testimony of the witness Lennon to the effect that Mrs. Summers possessed certain mortgages does not appear to have been material. It could not have prejudiced respondent. The force of the argument made by counsel for the people that the objections made to the testimony of the witness Hinchman are answered by the tendency of his own and other testimony to show that he and the respondent were co-conspirators has not escaped us. In view of the charge to the jury, we have preferred to sustain the rulings made upon the grounds already stated. However unnecessary, it was proper to permit the deputy auditor general to testify that he did in fact rely upon the certificate of respondent. It is not found that any reversible error was committed upon the trial.

On the part of respondent 59 requests to charge were preferred. It is impossible, within the proper limits of an

opinion, to set out these requests, or to compare them with the charge given. Thirty-seven of these requests are marked as given; others as refused or refused as presented. So far as the requests question the charge given with respect to the falsity of the certificate of the respondent, reference is made to what has already been said in this opinion upon that matter. Particular attention is paid in the brief for the respondent to the following infirmities in the charge as it was first given to the jury: (1) Upon the subject of the requirement that respondent's knowledge of the falsity of his certificate must be found beyond reasonable doubt. (2) The effect to be given to the testimony concerning the collateral cases which had been introduced. (3) The court's definition of a reasonable doubt.

As to the first of these the court said to the jury:

"It may well be asked at the outset, What are the facts necessary to be established, to prove the crime of obtaining money by a false pretense? These facts must be proved: There must have been a false pretense; that is, a fraudulent representation of some fact. That is a false pretense. This representation must have been made with a knowledge of its falsity. The purpose of it must be to cheat or defraud. And, being calculated to do this, it must be shown that it did actually deceive and defraud, causing the defrauded person to part with his money because of the false representation. Now, applying this description of the offense to this case, it is here charged, and, in order to justify a verdict of guilty at your hands, it must be proved to your satisfaction beyond every reasonable doubt, *first*, that Josephine Summers was not a stranger not belonging to this State; *second*, that at the time he certified to his bill and presented it to the auditor general the defendant knew that she was not a stranger not belonging to this State; *third*, that he intended to defraud the State out of the sum claimed by him in that bill; and, finally, *fourth*, that in reliance upon the representation made by him as to that in his certificate the State paid him the amount of his bill.

"The element that Mrs. Summers was not a stranger not belonging to this State is not disputed. This, how-

·ever, does not establish that the defendant had knowledge of that fact. Nor, of course, does it establish either of the remaining elements. To justify a verdict of guilty, all four elements must be proved. If any of them is not proved, or if you have any reasonable doubt as to any of them, you should acquit the defendant. If all are proved, you should convict him."

Further on in the charge he said:

"Now, one of the elements essential to be proved in the conduct of the defendant in the Summers inquest is guilty knowledge. The doing of the act involved here — that is, the making and presentation of the certificate to the auditor general — is not disputed; but the knowledge existing in the mind of the defendant at the time of the act is disputed. Was he aware that the representations he made in his bill and certificate were false?"

Later on, the jury being in court for further instructions, one of the jurors said:

' "I would like to have your honor's explanation of knowledge and intent."

And upon this subject the court said to the jury:

"Now, if he knew, when he did that [made out the bill for services and attached the certificate], that she was not a stranger not belonging to this State, and intended in presenting that bill to cheat and defraud the State out of the amount of the bill, and deceived the State by it, so that he got the amount of his bill, then the offense is proved. * * * It is for you to say, when the respondent made up that bill and sent it to the auditor general, did he know that she was a resident here? If he knew that, did he intend to cheat and defraud the State by making a State case out of that inquest in submitting that bill? If the State was deceived by it, and, relying on that bill, paid the money, and the facts are as set forth in the information, then the offense is proved."

And again:

"It is not disputed that the defendant as coroner submitted this bill, but the knowledge existing in the mind of the defendant at the time of the act is disputed. Was he aware that the representations made in the bill and certificate were false?"

As to the second objection stated, it is said that the
effect of the instruction which the court gave the jury
and its infirmity was that it permitted them to consider
the testimony adduced in the collateral cases as bearing
upon the question of the appellant's guilty knowledge in
the particular case on trial. This objection has been con-
sidered with reference to the admissibility of testimony,
and what is there said disposes of the objections made to
the charge based upon the same reasoning.

As to the definition of a reasonable doubt: Respond-
ent's request on the subject is marked "Given." It is
claimed, however, that as given in the general charge it
did not sufficiently cover the ground. The court said:

" To warrant a verdict of guilty, this presumption [of
innocence] must be overthrown by evidence which leaves
no reasonable doubt of his guilt. Now, what is a reason-
able doubt? It is not a mere possible doubt, because
everything relating to human affairs, depending upon evi-
dence, is open to some possible or imaginary doubt.
Proof beyond a reasonable doubt is such proof as satisfies
your judgment. It is proof which excludes every reason-
able theory of innocence. If, on any reasonable view of
the evidence, the facts proven are consistent with the in-
nocence of the respondent, or if they raise a reasonable
doubt of guilt, your verdict should be not guilty. To be
reasonable, however, a doubt must be founded upon rea-
son, and must be created, not by an outside source, but
must grow out of the evidence in the case. It is a doubt
for which a cause or reason can be assigned, and which
leads you to entertain a conscientious belief that there is
an absence of some necessary proof to show the respond-
ent guilty. If, after a consideration and comparison of
the entire evidence, your minds are in that condition that
you cannot say that you feel an abiding conviction to a
moral certainty of the truth of the charges brought against
this defendant, such a state of mind may be fairly said to
indicate the existence of a reasonable doubt. If, on the
other hand, you are of that certain mind that you are en-
tirely convinced and your reason and judgment are satis-
fied, from the evidence, that this respondent committed
the crime here charged, then you may be fairly said to have
no reasonable doubt of his guilt. Throwing aside the

technical language required to be used in explaining and defining what is and what is not a reasonable doubt, let me endeavor to summarize the law in these plain terms: If you, as men of careful judgment, have upon any material matter an honest, fair doubt, which is raised in your minds, not from an outside source, but by the evidence given here in open court, and which appeals to your sound judgment, such a doubt may rightly be said to be a reasonable doubt. The benefit of any such doubt must be accorded to the defendant by an acquittal. If, on the other hand, after applying your best judgment to the testimony, you are satisfied from the evidence that the crime charged was committed by this respondent, and no other reasonable conclusion is possible, then you are convinced beyond any reasonable doubt that he is guilty. And in that event your verdict should be one of guilty."

In other parts of his charge, the judge had said to the jury:

"The presumption of the law is that he is innocent until he is proven guilty. This presumption belongs to the defendant throughout the trial of the cause, until evidence is introduced proving him guilty to your satisfaction. The burden of establishing his guilt rests upon the people throughout the case. He is not required to establish his innocence, and consequently the fact that he has not testified in his own behalf should in no way be construed against him. There is no burden resting upon him. The only burden in the case rests upon the people, and that requires the prosecution to prove the guilt of the respondent in all its elements. This presumption of innocence attaches to every element of the offense charged."

It is said that a reasonable doubt does not necessarily have to grow out of the evidence in the case, but may arise from want of evidence, and that a reasonable doubt need not be one for which a cause or reason can be assigned. It may be said that it would not have been error to refuse a request to charge preferred in the exact language of the charge given. Considered as a whole, it is not evident that the jury were wrongfully advised, or in any manner misled. The criticism made by counsel was considered and rejected in *People* v. *Stubenvoll,* 62 Mich. 329, 332.

As to the proceedings after the jury had been charged and had retired: The jury retired about 10 o'clock a. m. on January 13th, and at about 11 o'clock on Saturday morning, the 14th, were by direction of the court, and without any request for further instructions, again brought into court, when the following took place:

"*The Court:* Will the foreman please rise? (Juror Rush Wilcox rose in his seat.)

"*The Court:* Mr. Foremân, is it a question of fact upon which the jury are differing?

"*The Foreman:* Yes, sir.

"*The Court:* That is all."

Thereupon the court proceeded at some length to instruct the jury, first, upon the subject of what was meant by the term " stranger not belonging to this State," and also and in a general way to say to them that they were required to decide the case solely and alone upon evidence given by witnesses; that deliberation meant an endeavor to reconcile their views under the law and the evidence, to weigh one side carefully against the other, to be honest and fair with one another. The jury having again retired, two additional requests to charge were presented by coun sel for defendant, whereupon the jury were again brought into court, and the first request preferred was given and the second denied. Then a third additional request to charge the jury was filed, but was not given. At 11:50 a. m., a request having been received from the jury to that effect, they were again brought into the court-room, instructions already given were repeated, and some further instructions given, in answer to queries propounded by jurors. At 4:10 p. m., a request to that effect having been received from the jury, they were again brought into court. In answer to a question from the judge, the foreman stated that they desired to have read the testimony of Bert High, Mrs. Mead, and Harry Schrum at the inquest of the Summers case. The court seems to have at first misunderstood the request, saying that the testimony was very lengthy and was taken by three stenographers

whom he would have read the testimony to the jury. Thereupon the foreman again stated that what they wanted was the original testimony that was shown in the court — that taken at the inquest. The court then asked them if, in addition to that, they wanted also what the witnesses swore to on the trial, and received the reply that all they wanted was the statements taken at the inquest. Counsel for the defendant requested the court to read also the statements of Dr. Stone and of Dr. Case. At about 5 o'clock, the papers having been produced, those asked for by the jury were read by the court. These having been read, a juror asked this question:

"How long has a person to live here in order to be a resident?"

Some instructions upon this point having been given by the court, the jury again retired. At 5:38 the jury rendered a verdict of guilty as charged.

"*The Court:* You are discharged, gentlemen, from further consideration of the—

"*Mr. Wilkins:* I would like the jury polled.

"*The Court:* The verdict has already been received and recorded. I think the request for polling comes too late. However, the jury may be polled."

The jury was polled. In answer to the usual formal question, "Was this and is this your verdict?" three jurors answered, "It is now." The verdict as a whole was then again taken and the jury excused; an objection being entered by counsel for respondent to receiving the verdict, based upon the answers' of three of the jurors already stated. The court declined to enter a stay of proceedings or to take any bail for the release of respondent, both of which were applied for by counsel. On Monday morning, defendant having been brought into court, his counsel announced they had a motion in arrest of judgment, and such a motion was entered. It was at once denied, and the court thereupon sentenced defendant to imprisonment in the State prison at Jackson for not less than 4 years, and made an order giving respondent 90

days in which to move for a new trial or settle a bill of .exceptions.

There followed, on April 6th, the presentation of a motion for a new trial, based upon the records, files, and testimony, and upon various exhibits and affidavits, to which were opposed counter affidavits taken and filed on the part of the people. The new matter presented as a foundation for this motion consisted of a showing made up of the examination of one of the jurors on his voir dire and certain affidavits tending to show that the juror had not honestly answered the questions in his examination and was not an impartial juror. It is enough to say that counter affidavits were filed, that the issue raised was determined by the court upon the showing and counter showing, and this determination would not be disturbed here, even if the counter showing was less conclusive than it appears by the record to have been. The affidavits of four of the jurymen were filed. These were to the effect that, while the jury were deliberating and discussing the evidence, the officer or officers in charge of the jury looked through the keyhole of the door of the jury-room and spied upon the jurors, and that the fact that such officer or officers were within hearing and were listening and spying was known to and commented upon by the jurors during their deliberations, and before a verdict had been agreed upon, and entered into their deliberations and discussion. One of these affidavits contains the following statement:

" Deponent further says that on Saturday morning, January 14, 1905, before the jury had agreed upon their verdict, they were called into the courtroom and particularly and especially charged by the court on some matters that were under discussion at the time said officers were listening as aforesaid, and that the jury were, after they had been so charged afresh, sent back into their jury room to deliberate further upon their verdict, and that the matter of their having been so charged by the court, on Saturday morning, upon matters under discussion while the officers were so listening, was then and there commented

upon and discussed by the jurors during their delibera-
tions on their verdict, and before they had agreed upon
their verdict, and that it was then remarked by some of
said jurors that their discussions in the jury-room and
what was said by the different jurors, in the course of
such discussion and as a part of the deliberations of such
jury, must have been reported by said officers, and de-
ponent says that these matters entered into the discussion
of the jury upon their verdict in said cause."

Others of the affidavits in different form also stated in
substance that the additional instructions which the court
gave them on Saturday when they were first brought into
the court-room without any request on the part of the
jury for further instructions were upon a subject discussed
in the jury-room. It is said by counsel that upon the
whole record it plainly appears that the verdict was not
the voluntary one of all the jurymen, but was coerced by
the repeated and erroneous charges of the court and the
refusal of the requests made by the appellant, together
with the knowledge the jury had of the fact that their de-
liberations were being listened to and spied upon by offi-
cers, and that the verdict was finally forced by the court's
reading aloud a part only of the documents that were be-
fore the respondent when he made out his bill and signed
a certificate, and that for these reasons a new trial should
be granted. Upon the hearing of the motion for a new
trial, the trial judge refused to consider the affidavits of
these jurors, upon the ground that they were excluded by
the familiar rule that the affidavits of jurors will not be re-
ceived to impeach their verdict. The rule is not disputed
by counsel for respondent. What they deny is its appli-
cation here; the argument being that the affidavits were
not offered for the purpose of impeaching the verdict, but
for the purpose of showing that a rule founded in public
policy had been violated, and that in this case, as in the
case of *People* v. *Knapp*, 42 Mich. 267, the attention of
the court having been directed to the fact, the court was
bound to consider the said affidavits, and, as against those
offered in opposition thereto, to at least weigh, consider,

and determine whether there had been interference with the deliberations of the jury.

In *People* v. *Knapp* it appeared on a motion for a new trial that when a jury retired to consider of their verdict an officer accompanied them and remained in the room during their deliberations. The attention of the court having been called to the fact on a motion for a new trial, but it being made to appear that the officer did not converse with the jury in their room, the court denied the motion, upon the assumption that under the circumstances the defendant could not have been injured by the officer's presence in the room. Of this Judge COOLEY, who wrote the opinion, said:

" It is not claimed that the officer can with propriety be allowed to be within hearing when the jury are deliberating. Whether he does or does not converse with them, his presence to some extent must operate as a restraint upon their proper freedom of action and expression. When the jury retire from the presence of the court, it is in order that they may have opportunity for private and confidential discussion, and the necessity for this is assumed in every case, and the jury sent out as of course, where they do not notify the court that it is not needful. The presence of a single other person in the room is an intrusion upon this privacy and confidence, and tends to defeat the purpose for which they are sent out. * * *

" But the circumstances of particular cases may make it especially mischievous. In their private deliberations the jury are likely to have occasion to comment with freedom upon the conduct and motives of parties and witnesses, and to express views and beliefs that they could not express publicly without making bitter enemies. Now the law provides no process for ascertaining whether the officer is indifferent and without prejudice or favor as between the parties; and as it is admitted he has no business in the room, it may turn out that he goes there because of his bias, and in order that he may report to a friendly party what may have been said to his prejudice, or that he may protect him against unfavorable comment through the unwillingness of jurors to criticise freely the conduct and motives of one person in the presence of another who is his known friend. Or the officer may be present with

a similar purpose to protect a witness whose testimony was likely to be criticised and condemned by some of the jurors. Suppose some member of the officer's family had given important evidence in the case; what reason can there be for expecting that this evidence would be freely canvassed and carefully considered in his presence? But the case may touch him still more nearly. In criminal cases especially, officers frequently become important witnesses; and no one can have had much to do with such trials without feeling that unusual care and caution is necessary in the examination and sifting of their evidence, in order to guard against a natural tendency to allow the facts to be colored by their prepossessions, especially in the case of those they have themselves arrested or accused. If, under such circumstances, the officer may be present when his own evidence is to receive its final sifting, the accused may well suspect he is tried and judged unfairly. Nor will it do to leave the case for subsequent investigation in order to ascertain whether the suspicion is well founded. The time of the court cannot be taken up with such inquiries; and, if it could be, the result would not always remove the suspicion. The only proper and just course is to insist upon a rigorous observance of the proper practice in order to prevent all occasion for injurious suspicions.

"The public are concerned in this, as well as the accused; and the public is also concerned in not having the deliberations of the jury reported for news gatherers and scandal mongers outside. Jurors are generally expected to keep their own counsel, because they have an interest in doing so; but the officer is under no corresponding restraint, and it is through him that what takes place in the jury-room is most likely to leak out. The courts should see to it that, as far as possible, an officer disposed to do this species of mischief is deprived of the opportunity."

In the case before us, no officer entered the jury-room. It is stated in the affidavits of the officers, filed in opposition to the motion, that they did not look through the keyhole into the jury-room nor spy upon the jury. The jury-room was adjacent to the court-room, the door to the room locked, and officers, assigned to take charge of the jury, relieved each other as occasion demanded. It appears, also, that the discussions of the jurors were so animated that their voices and portions of their remarks

could be heard in the court-room, and that the officer in charge of the police detail which had charge of the jury reported this fact to the court, and received from the court instructions to clear the room of all persons except the officers. Neither the lieutenant in charge of the police detail nor any of the officers stated in their affidavits that they did not communicate to other persons the state of the deliberations of the jury, although each of them does state that at times part of the talk and argument indulged in in the jury-room could be heard 30 feet or more away from the jury-room. It is conceded by counsel that if the court had weighed the matters presented in the affidavits of the jurors, and reached a conclusion based upon all the affidavits and all that was contained in all of them, this court might be fairly concluded by the determination of the trial judge. What is claimed is that, the court having stricken from the files or refused to consider those portions of the affidavits of jurors which tended to show that the verdict might have been affected by the alleged presence and spying of officers, this court should determine whether a new trial should have been granted upon the showing made. Without determining, and also without questioning the application in criminal cases of the rule laid down by this court in the case of *In re Merriman's Appeal*, 108 Mich. 454, it is sufficient to say here that there is not to be found in the affidavits in support of the motion matter which throws doubt upon the verdict as one influenced in any way by the presence of the officers in the adjoining room. No court should hesitate to apply the principle stated in the case of *People* v. *Knapp* in a case requiring such application, since nothing could bring greater reproach upon the administration of the law than well-founded suspicion that verdicts were in any manner coerced. On the other hand, verdicts are not presumed to be improperly rendered nor to be lightly set aside. We assume that the jury occupied suitable quarters, and no reason is suggested for their publishing their debates to any one outside the jury-room. The evidence

strongly supports the verdict rendered. Should the ver-
dict be disturbed because of a probability or possibility that
the officers reported to the trial judge what jurors were
saying, and, because of such reports, the jury were recalled
and were coerced by additional instructions? The judge
of a trial court is not a mere figurehead. He is charged
with the direction of important public business. The atmos-
phere of the trial court room cannot be carried to a court
of errors, nor can the considerations which moved the
trial judge to action be displayed in the printed record.
What he says and does in the conduct of a trial which ap-
pears upon the record may be considered, and, if wrong,
corrected. If convinced for any reason that the instructions
he has given to a jury should be amended, corrected, or en-
larged, he ought to give additional instructions, and such ad-
ditional instructions, like those first given, may be reviewed.
If the law is correctly stated, instructions are not to be held
erroneous because given at one time rather than at another
time. That additional or repeated instructions are given for
the purpose of coercing a verdict will not be presumed, nor
be found except upon convincing evidence. It is to be noted
that the additional and unrequested charge was, in so far
as it related to the subject of the meaning of the term
"stranger not belonging to this State," one the substance
of which counsel for respondent had requested should be
given and most favorable to respondent. It is also appar-
ent, if one may judge by the questions asked by jurors,
that the jury debated the existence of a fact, viz., the act-
ual residence of Mrs. Summers, which had been conceded
by respondent's counsel. There is nothing in the matter
presented to the court upon the application for a new trial
which convinces us that a new trial should have been
granted.

Only such of the errors assigned as were deemed to re-
quire discussion have been noticed. All have been care-
fully and patiently considered, with the result that preju-
dicial error is not found in the record. Respondent was
represented by able counsel, appears to have had a fair

trial, and to have been convicted because the evidence required a conviction. The court below is advised to proceed to execute its judgment and sentence.

Affirmed.

McAlvay, Grant, Montgomery, and Hooker, JJ , concurred.