## PEOPLE v WILLIAMS #2

1. CRIMINAL LAW—EVIDENCE—HEARSAY—DYING DECLARATIONS.

A statement by a decedent that he was shot by the accused is admissible as a dying declaration where the evidence clearly demonstrated that the decedent sensed his impending death at the time he spoke even though he uttered no statement explicitly indicating an expectation of imminent death.

2. CRIMINAL LAW—RES GESTAE WITNESSES.

Res gestae witnesses include not only eyewitnesses but also a witness having contact with the defendant reasonably contemporaneous with the crime whose testimony tends to show the state of mind with which a criminal act was done.

3. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES—IMPEACHMENT.

The people are entitled to impeach the credibility of a properly endorsed and called res gestae witness by the use of his prior inconsistent statement (MCLA 767.40a).

4. CRIMINAL LAW—IMPEACHMENT—PRIOR INCONSISTENT STATEMENTS.

Cross-examination of a res gestae witness by the prosecutor as to a prior inconsistent statement should be controlled by the trial judge so that it goes to the issue of credibility and is not used as a subterfuge to place before the jury the entire contents of the prior statement.

REFERENCES FOR POINTS IN HEADNOTES
[1] 29 Am Jur 2d, Evidence §§ 676, 677.
　40 Am Jur 2d, Homicide § 384 *et seq.*
[2] 29 Am Jur 2d, Evidence § 708.
[3, 4] 30 Am Jur 2d, Evidence § 1082.
[4] 29 Am Jur 2d, Evidence § 267.
　58 Am Jur, Witnesses §§ 748–753.
[5, 6] 21 Am Jur 2d, Criminal Law § 333 *et seq.*
[7] 53 Am Jur, Trial §§ 485, 486.
[8] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*
[9] 21 Am Jur 2d, Criminal Law §§ 12, 223.

5. CRIMINAL LAW—WITNESSES—PRELIMINARY EXAMINATION TESTI-
   MONY—CONFRONTATION—CONSTITUTIONAL LAW.

   A statute permitting the prosecution to utilize a witness's prelim-
   inary examination testimony whenever the witness giving such
   testimony cannot, for any reason, be produced at the trial is
   circumscribed by the constitutional right of a defendant to be
   confronted by a res gestae witness against him; the prosecutor
   has the duty to show due diligence and a good-faith effort to
   obtain the presence of a witness before his absence can be
   excused and his preliminary examination testimony used at the
   trial (MCLA 768.26).

6. CRIMINAL LAW—WITNESSES—PRODUCTION OF WITNESSES—DUE DILI-
   GENCE—CONSTITUTIONAL LAW.

   Due diligence and a good-faith effort by the prosecutor to produce
   a witness against the accused consistent with the constitutional
   right of confrontation were not present where the police went
   to the home of the witness to find her on the night before the
   trial and called the witness by telephone twice on the day of
   the trial at home and once at her place of employment but
   could not find her, but where the record shows no evidence that
   a subpoena was issued, that the prosecutor made any effort to
   contact the witness before the trial, or that the witness was out
   of the state or even out of the city.

7. CRIMINAL LAW—ARGUMENT OF COUNSEL—PROSECUTOR'S COMMENTS
   —BELIEF.

   The prosecutor during final argument in a murder trial may not
   assert a belief in the defendant's guilt without relating the
   belief to the evidence; a prosecutor asserts a belief in the
   defendant's guilt when he imputes to a witness the purported
   knowledge that defendant is capable of cold-blooded murder
   and thus assumes as proven a critical issue which was solely
   for the jury to resolve.

8. CRIMINAL LAW—PRESERVING QUESTION.

   Failure to object is and should be a bar to review only when the
   goal of the objection would, in all likelihood, have eliminated
   the prejudice.

9. CONSTITUTIONAL LAW—CRIMINAL LAW—PROCEDURE—AMENDMENTS.

   Only the Michigan Supreme Court has the power to modify the
   provisions of a legislative enactment in the exercise of its
   constitutional power by general rules to establish, modify,
   amend, and simplify the practice and procedure in all courts of
   this state; therefore it was error for the trial judge to incorpo-
   rate into his pretrial order a time limitation not in accordance

with the statute for the filing of a notice of an alibi defense on the assumption that he had a right to set reasonable rules to allow for an orderly procedure in trial (Const 1963, art 6, § 5; MCLA 768.20).

Appeal from Recorder's Court of Detroit, Joseph A. Gillis, J. Submitted Division 1 January 3, 1973, at Detroit. (Docket No. 13336.) Decided March 27, 1973.

Willie L. Williams was convicted of first-degree murder. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Edward R. Wilson,* Assistant Prosecuting Attorney, for the people.

*Carl Ziemba,* for defendant on appeal.

Before: V. J. BRENNAN, P. J., and T. M. BURNS and ADAMS,* JJ.

ADAMS, J. Defendant was convicted of first-degree murder (MCLA 750.316; MSA 28.548) by a Detroit Recorder's Court jury and now appeals as of right.

## Issue I

*Did the trial court commit reversible error by admitting into evidence as a dying declaration the deceased's hearsay statement as to who shot him?*

Mrs. Donna Rutledge, wife of deceased victim

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Arthur Rutledge, testified that at about 5 a.m. on June 12, 1971 she was awakened by shots, ran outside, and found her wounded husband lying in the street. In response to Mrs. Rutledge's query as to where he was shot, her husband replied, "All over", and when asked the identity of his assailant responded, "Billy Williams". Mrs. Rutledge related that the deceased was moaning and as his final utterance in her presence exclaimed, "Oh, God help me". The trial judge admitted this testimony as a dying declaration exception to the hearsay rule.

At approximately 5:25 a.m. Mr. Rutledge was pronounced dead on arrival at a hospital. The examining pathologist testified that decedent succumbed to gunshot wounds of the chest and abdomen and opined that a person with such wounds could possibly remain conscious for a period of 30 seconds to 5 minutes.

Although Mr. Rutledge uttered no statement explicitly indicating an expectation of imminent death, no such utterance is required for a dying declaration. In *People v Arnett,* 239 Mich 123, 131–132 (1927), the Court stated:

"All authorities hold that the [dying] declarations must be sanctioned by belief on the part of the declarant that he is about to die; otherwise they are but hearsay. The rule admitting dying declarations is one of necessity and prevails only in case they are sensed by the declarant as *dying statements.* When Mr. Henkel made the statements was he conscious of impending death? Some wounds certify death. Such a wound was given the sheriff. He was not asked if he was aware of impending death or informed that his death was imminent, nor did he express himself on the subject, so far as this record discloses. When the first bullet ripped its course through his vitals his hours were numbered. His stoical bearing, restraint of emotions and retention of

opinion or knowledge on the subject of dissolution do not at all rule the admissibility of his statements. [Citation omitted.] To say he did not sense impending death would accord him less than ordinary intelligence." (Emphasis by the Court.)

See also *People v Gorman,* 252 Mich 603, 605–606 (1930).

The evidence in this case clearly demonstrates that Mr. Rutledge sensed his impending death at the time he spoke the statement. The trial judge properly admitted it into evidence.

### Issue II

*Did the trial court commit reversible error by permitting the prosecutor to impeach a witness called by the prosecution by reading to him the substance of a statement which the witness had previously made to the police and by calling the officer in charge of the case to repeat what the witness had told him?*

The prosecution endorsed the name of John Ross upon the information as a res gestae witness. Prior to trial, Ross had given police officers a signed statement averring that on the evening before the shooting defendant had offered to reward him if he would reveal the whereabouts of Arthur Rutledge. When called to testify at defendant's trial, Ross admitted that he had spoken to the police, acknowledged that a written statement had been prepared and identified his signature on the document, but denied having made certain portions of the statement and claimed he could not recall other portions. After a perusal of the writing failed to refresh Ross' memory, the prosecutor questioned him regarding the statement and later called a police witness to describe the document's

contents. Defendant objected to these procedures and now contends that they resulted in the improper admission of incompetent evidence.

While res gestae witnesses are frequently considered to be eyewitnesses, they are not necessarily so. The res gestae classification is not restricted to those who have personally observed the act in question. See *People v Etter,* 81 Mich 570 (1890); *People v Kayne,* 268 Mich 186 (1934); *People v Jelks,* 33 Mich App 425 (1971). Where, as here, a witness's contact with a defendant is reasonably contemporaneous with the crime and tends to show the state of mind with which a criminal act was done, that evidence comprises a part of the res gestae. The witness qualifies as a res gestae witness. *Maher v People,* 10 Mich 212 (1862); *People v Ake,* 362 Mich 134 (1961).

Since Ross was properly endorsed and called by the prosecution as a res gestae witness, the people were entitled to impeach his credibility by use of his prior inconsistent statement. MCLA 767.40a; MSA 28.980(1) provides:

"Witnesses whom the people are obliged by law to call as res gestae witnesses may be impeached the same as though such witnesses had been called by the respondent."

Such impeachment testimony did not establish the prior statement as substantive evidence so as to permit the prosecutor to argue the truth of it to the jury. Consequently, cross-examination as to the prior statement should be controlled by the trial judge so that it does go to the issue of credibility and is not used as a subterfuge to place before the jury the entire contents of the prior statement. See Issue V, *infra.* The trial judge instructed the jury to limit their consideration of the impeachment

testimony to the issue of Ross' credibility. Defendant's allegation of error is without merit.

### *Issue III*

*Did the trial court commit reversible error by ruling that the prosecution had made a good-faith effort to produce two witnesses and by allowing their preliminary examination testimony to be read to the jury?*

At the preliminary examination, Mrs. Lucille Sparks testified that she had been parked in her car four houses away from where deceased was shot. She heard him hailed by the name "Arthur" from a green 1971 Chevrolet from which the shots came. As the only eyewitness to the murder, her testimony was crucial to the people's case.

The following actions were taken by the prosecution to obtain the presence of Lucille Sparks at the trial: Sergeant Dougal, the police officer in charge of the case, sent the police to her house to find her on the night before she was supposed to testify. They could not locate her. In the morning and also at noon on November 30, 1971, Sergeant Dougal called the witness's house and spoke with a youngster who told him that Mrs. Sparks was not at home. The following day Sergeant Dougal testified that he thought the witness might be in Detroit, although he acknowledged that he had not asked the Federal authorities to help locate her. Just before a court reporter read Mrs. Sparks' preliminary examination testimony into the record, the trial judge had Sergeant Dougal call the witness's place of work in an effort to find her. Officer Dougal then told the court that she was not at work and added that her employer said he had been trying to call her for two days but could not locate her.

While it is true that MCLA 768.26; MSA 28.1049 permits the people to utilize a witness's preliminary examination testimony "whenever the witness giving such testimony can not, for any reason, be produced at the trial", this statute is circumscribed by the constitutional right of a defendant to be confronted by a res gestae witness against him. The prosecutor in this case had a duty to show due diligence and a good-faith effort to obtain the presence of the witnesses before their absence could be excused and their preliminary examination testimony used at trial.

In *People v Herman Brown,* 38 Mich App 69, 75 (1972), this Court said:

"We determine that the defendant had a right to have the indorsed *res gestae* witness present at trial because he was one of only two *res gestae* witnesses who purportedly viewed the crime. His testimony at the preliminary examination was highly damaging to the defendant, and the fact that Sergeant Charrier may have been subject to cross-examination at the preliminary examination does not satisfy the right to confrontation since that right also includes 'the occasion for the jury to weigh the demeanor of the witness'. *Barber v Page* [390 US 719, 724–725; 88 S Ct 1318, 1322; 20 L Ed 2d 255, 260 (1968)]; *People v Nieto,* 33 Mich App 535, 538 (1971)."

In the present case, Lucille Sparks was the only witness to the murder. She testified at the preliminary examination that the car from which the bullets were fired was very similar to the car owned by defendant. Her testimony must have been very damaging to the defense.

There is no evidence in the record that a subpoena was issued for Lucille Sparks or that the prosecution made any attempt to locate her until the trial started. See *People v Zabijak,* 285 Mich

164, 171–172 (1938). There is no evidence that the witness had left the state or even the city. In this case, a trial date of November 15, 1971 was set on August 16, 1971. The lack of diligence by the people in securing the presence of vital res gestae witness Lucille Sparks is reversible error. *People v McIntosh,* 389 Mich 82 (1973). Analogous facts and reasoning compel a similar conclusion as to witness Robert Bussey. The preliminary examination testimony of both witnesses was improperly received into evidence at trial.

## Issue IV

*Did the prosecutor commit prejudicial error by asking defendant whether he had burned his car?*

There was some testimony to the effect that defendant's car burned up shortly after decedent was shot by three men in a similar car. While there was no evidence to establish that defendant set his car on fire, the question was legitimate cross-examination.

## Issue V

*Did the prosecutor commit prejudicial error by stating to the jury in closing argument that Ross had changed his testimony because he knew "defendant is capable of cold-blooded murder"?*

Ross testified that he was out of jail on parole, that he currently had two cases pending against him, and that he had spoken with defendant in the "bull pen" before trial. Sergeant Dougal testified that he and an assistant prosecutor overheard defendant speak with Ross in the "bull pen", that he heard defendant tell Ross that they had no case against defendant, that it was all hearsay, and for Ross to testify that he (Ross) was under the influ-

ence of drugs when he made his statement to the police. Ross did so testify. In his closing argument, the prosecutor suggested to the jury that Ross may have changed his testimony because he was afraid of what defendant would do to him if they both ended up in the same prison. The prosecutor stated:

"That if each stands convicted, both stand a very likely and a very good chance of being sent to the same place, which perhaps might motivate a man who knows that this defendant is capable of cold-blooded murder. Motivate him and silence his tongue, prevent him from relating the facts to you that he knows to be true."

In *People v Humphreys,* 24 Mich App 411, 414 (1970), this Court declared:

"Although the prosecutor is free in final argument to relate the facts to his theory of the case, and in so doing say that certain evidence leads him to believe the defendant is guilty, *People v Hess* (1891), 85 Mich 128; *People v Boos* (1909), 155 Mich 407; *People v McElheny* (1922), 221 Mich 50, he may not express a belief in the defendant's guilt without relating the belief to the evidence. *People v Quick* (1885), 58 Mich 321; *People v Dane* (1886), 59 Mich 550; *People v Hill* (1932), 258 Mich 79."

In the case at bar, the prosecutor asserted his belief in defendant's guilt by imputing to Ross the purported knowledge that defendant was "capable of cold-blooded murder", thus assuming as proven a critical issue which was solely for the jury to resolve. Defendant did not object to the prosecutor's misstatement or request a cautionary instruction. In *People v Montevecchio,* 32 Mich App 163, 166 (1971), this Court stated:

"Although defendant did not object to the prosecutor's remarks and did not request a cautionary instruc-

tion by the trial judge, the failure to object is and should be a bar to review only when the goal of the objection would, in all likelihood, have eliminated the prejudice. *People v Humphreys* (1970), 24 Mich App 411.

"In the instant case, the goal of an objection by the defendant would have been a cautionary instruction by the trial judge. In our opinion an instruction would not have eliminated the prejudice created by the prosecutor's inflammatory remarks. Defendant's failure to object will not, therefore, bar this Court from affording the appropriate relief."

See also *People v Hill,* 258 Mich 79 (1932); *People v Ignofo,* 315 Mich 626 (1946); *People v Slater,* 21 Mich App 561 (1970). The prosecutor's remark in this case was irremediably prejudicial. In addition, to the extent that the prosecutor argued the truth of the written statement Ross had given to police officers, his argument was improper. See Issue II, *supra.*

### *Issue VI*

*Did the trial judge commit reversible error by instructing the jury that "certainly the use of a deadly weapon implies malice"?*

Malice is an element of the crime of first-degree murder to be determined from the facts as shown and the law as given by the trial judge. The use of a deadly weapon is a fact from which malice can be found, depending upon the circumstances of the case. To the extent that the judge's charge might have been understood to state that use of a deadly weapon constitutes malice as a matter of law, it could have misled the jury.

Defendant, however, did not object to the charge as given. GCR 1963, 516.2. An examination of the record in this case compels the conclusion that any

error complained of has not resulted in a miscarriage of justice. MCLA 769.26; MSA 28.1096.

## Issue VII

*Did the trial judge commit reversible error by instructing the jury on the law of aiding and abetting?*

The evidence indicated that a car occupied by three men and similar to the car owned by defendant stopped in front of deceased's house. Someone in the car called out, "Hey, Arthur", and three or four bullets were fired. This testimony, together with the other testimony in the case, was sufficient to allow a jury to find that, if defendant did not kill decedent himself, he aided and abetted someone else in committing the crime. MCLA 767.39; MSA 28.979. The instruction was not erroneous.

## Issue VIII

*Did the trial court commit reversible error by refusing to allow defendant to place before the jury a defense of alibi because defendant failed to file a notice of alibi by the deadline set by the court?*

In a pretrial order dated August 16, 1971, the trial court required that any notice of alibi be filed by September 17, 1971. Notice of an alibi defense was not filed until November 11, 1971. At the beginning of the trial on November 29, 1971, defense counsel made an objection to the court's refusal to allow him to plead an alibi defense. The trial court stated, "I think the court has a right to set reasonable rules to allow for an orderly procedure in trial".

MCLA 768.20; MSA 28.1043 provides for filing a defense of alibi "at the time of arraignment or

within 10 days thereafter but not less than 4 days before the trial of such cause".

The trial judge, in addition to asserting his general authority, also relied upon Rule 17 of the Recorder's Court. Rule 17 provides, *inter alia,* for the adoption of a specified pretrial statement form containing, *inter alia,* a "yes" or "no" blank to be checked by defense counsel as to an alibi defense. Said form is to be completed within 30 days after defendant's arraignment on the information. Rule 17 further provides that all parties shall be prepared to assert at the pretrial conference defenses set forth in the pretrial statement, but the rule does not specify what happens if the "yes" blank under "Alibi Defense" on the pretrial statement form is not checked within the 30-day period. There is, therefore, a serious question as to whether Rule 17 grants to the trial judge the authority asserted by him.

Even if Rule 17 did so provide, it would lack validity in the face of the statute. Only the Michigan Supreme Court has the power to modify the provisions of a legislative enactment in the exercise of its Const 1963, art 6, § 5 power "by general rules [to] establish, modify, amend and simplify the practice and procedure in all courts of this state". *Pressley v Wayne County Sheriff,* 30 Mich App 300 (1971); *Krell v Wayne Circuit Judge,* 246 Mich 412 (1929). See also the authors' comments to GCR 1963, 11, 1 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), pp 5–6.

The error of the trial judge as to this issue is a further reason why this case must be reversed.

Reversed and remanded for a new trial.

All concurred.