PEOPLE v WILBORN

1. CRIMINAL LAW—INSTRUCTIONS TO JURY—AIDING AND ABETTING—
   STATUTES—EVIDENCE.
   The aiding and abetting statute is appropriately included in jury
   instructions only where there is evidence that more than one
   person was involved in the commission of a crime and where
   there is evidence that the defendant's role in the commission of
   the crime may have been something less than direct commis-
   sion thereof (MCLA 767.39).

2. HOMICIDE—FELONY MURDER—INSTRUCTIONS TO JURY—ADDITIONAL
   INSTRUCTIONS—SUA SPONTE INSTRUCTIONS—COERCION OF JURY
   —PREJUDICE.
   Additional instructions to the jury in a felony murder trial are
   found to have been given for the purpose of coercing a verdict,
   and a new trial is mandated, where the trial court gave the
   additional instructions *sua sponte* and reminded the jury that
   possession of property stolen from the scene of the crime may
   or may not be evidence of guilt of the crime, and where the
   court suggested that the fact that four people had been killed
   may have raised a question in the jurors' minds that more than
   one person participated in the crimes, repeated the aiding and
   abetting statute when there was no evidence to support a
   conviction on the theory that the defendant procured, coun-
   seled, aided or abetted anyone, suggested that the juror or
   jurors with the minority view should consider a re-examination
   of their position, left a possible impression that the defendant
   could be convicted of murder if he was an accessory after the

REFERENCES FOR POINTS IN HEADNOTES
[1] 75 Am Jur 2d, Trial § 724.
[2] 75 Am Jur 2d, Trial § 1001.
   76 Am Jur 2d, Trial § 1055.
[3, 4] 75 Am Jur 2d, Trial § 906.
   58 Am Jur, Witnesses § 685 *et seq.*
[4] 29 Am Jur 2d, Evidence § 412 *et seq.*
[5] 40 Am Jur 2d, Homicide §§ 374, 387, 389, 468.
   Asserted opinion or conclusion, admissibility in criminal trial of
   dying declarations involving. 86 ALR2d 905.

fact, emphasized only the prosecution's theory of the case, and conveyed an unmistakable impression that the judge was of the opinion that the jury should return a verdict of guilty.

3. CRIMINAL LAW—EVIDENCE—SUBSTANTIVE EVIDENCE—WITNESSES—
DEFENDANT AS WITNESS—INSTRUCTIONS TO JURY—IMPEACHING
DEFENDANT'S TESTIMONY—CREDIBILITY—LIMITING INSTRUCTIONS.

No reversible error occurred when the jury in a criminal case was not informed that certain evidence was to be considered only for purposes of impeaching the testimony of the defendant, even though such evidence was substantive circumstantial evidence of the most damaging kind, where the defendant made no request for an instruction which would limit the jury's consideration of the evidence to the issue of defendant's credibility and not allow consideration of it as substantive evidence of guilt.

4. SEARCH AND SEIZURE—CONSTITUTIONAL LAW—CRIMINAL LAW—EVI-
DENCE—ADMISSIBILITY OF EVIDENCE—WITNESSES—DEFENDANT
AS WITNESS—IMPEACHING DEFENDANT'S TESTIMONY.

Handgun shell casings obtained by an unconstitutional search and seizure may not be introduced in evidence in a criminal case to impeach the testimony of a defendant; but where it is only strongly suggested by the record that the evidence was unconstitutionally obtained and where the Court of Appeals reverses and remands the case on other grounds, the Court of Appeals does not foreclose the prosecution's effort to justify the search at a future testimonial hearing.

5. HOMICIDE—EVIDENCE—DYING DECLARATIONS—DECEASED'S PRIMARY
KNOWLEDGE—JURY QUESTION.

A dying victim's positive statements as to the identity of a malefactor are always admissible in evidence when the deceased was in a position to know the fact stated, but, where it was manifestly impossible that deceased could have seen his assailant, a mere expression of opinion as to who he was is not admissible as a dying declaration, and where want of knowledge does not appear either from the statement itself or from other evidence in the case it must be presumed that the deceased stated a fact within his knowledge; under such circumstances it is a question for the jury whether the declarations represent the primary knowledge of the deceased or merely his opinion.

Appeal from Recorder's Court of Detroit, George T. Ryan, J. Submitted Division 1 June 24, 1974, at

Detroit. (Docket No. 15004.) Decided January 6, 1975.

Lucius Wilborn was convicted of first-degree murder. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief Appellate Department, *Patricia J. Boyle,* Principal Attorney Research, Training & Appeals, and *Thomas M. Khalil,* Assistant Prosecuting Attorney, for the people.

*Wilfred C. Rice,* for defendant.

Before: BASHARA, P. J., and DANHOF and CHURCHILL,* JJ.

CHURCHILL, J. A jury found Lucius Wilborn guilty of four counts of felony murder. He received the mandatory concurrent natural life sentences for murder in the first degree. MCLA 750.316; MSA 28.548. He appeals of right.

In the early morning hours of December 8, 1971, four or five occupants of a two story residence at 5055 W. Outer Drive in the City of Detroit were tied up and shot in the head. All of them died. The premises were ransacked. Several thousand dollars and some jewelry were missing. Ironically, one victim who was shot in both sides of the head lived long enough to identify the defendant as the person who shot him.

The defendant introduced evidence to support his claim of alibi. The prosecution introduced evidence that the defendant was in subsequent pos-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

session of the suitcase and money taken from the crime scene.

The judge included the aiding and abetting statute in his instructions.[1] The defendant made a timely objection to the instruction.

The aiding and abetting statute is appropriately included in jury instructions only when there is evidence that more than one person was involved in the commission of a crime and when there is evidence that the defendant's role in the commission of the crime may have been something less than direct commission thereof. *People v Ware,* 12 Mich App 512; 163 NW2d 250 (1968), *People v McClendon,* 48 Mich App 552; 210 NW2d 778 (1973), *People v Sharon Brown,* 35 Mich App 330; 192 NW2d 671 (1971), *People v Repke,* 103 Mich 459; 61 NW 861 (1895). Here there was evidence that would support a finding that the defendant was present at the scene, shot four people and stole a suitcase full of money. There was also evidence to support a finding that others committed the murders and subsequently delivered the suitcase full of money to him. There was no evidence to support a conviction on the theory that he procured, counseled, aided or abetted anyone. It would have been far more appropriate to have omitted the reference to the statute, and to have instructed the jury that he could be convicted if he was present at the scene and participated in the killings whether or not anyone else was involved. We need not, however, determine if the original instructions constituted reversible error because far more prejudicial error occurred during the course of deliberations.

The jury began its deliberations on Monday, June 5, 1972, and it continued to deliberate

---

[1] MCLA 767.39; MSA 28.979.

throughout the week. On Thursday morning the jury asked for some reading back of testimony concerning certain phone calls. Although the judge did not express an outright refusal to have the testimony read back, he sent them back with the suggestion that the minority should rely on the memories of the majority with respect to phone calls.

Later in the day the judge, *sua sponte,* told the jury:

"The Court is going to give you some additional instructions which I think will be of benefit to you in hopefully arriving at a fair and just verdict."

He then reminded the jury that possession of stolen property may or may not be evidence of guilt of the crime. He suggested that the fact that four people had been killed may have raised a question in their minds that more than one person participated in the crimes. He then repeated the aiding and abetting statute and suggested that the juror or jurors with the minority view should consider a re-examination of their position.

Notably absent from the Thursday instruction was any reference to the defense of alibi.

In *People v Hoffmann,* 142 Mich 531, 585; 105 NW 838, 857 (1905), the Court said:

"If convinced for any reason that the instructions he has given to a jury should be amended, corrected, or enlarged, he ought to give additional instructions, and such additional instructions, like those first given, may be reviewed. If the law is correctly stated, instructions are not to be held erroneous because given at one time rather than at another time. That additional or repeated instructions are given for the purpose of coercing a verdict will not be presumed, nor be found except upon convincing evidence."

Never is the court's apparent neutrality, or lack thereof, more significant than when volunteering instructions to a divided jury in a murder trial.

Here the instruction repeated the previous error, left a possible impression that he could be convicted of murder if he was an accessory after the fact and, by emphasizing only the prosecution's theory of the case, conveyed an unmistakable impression that the judge was of the opinion that the jury should return a verdict of guilt. A new trial is mandated.

There are several other issues on appeal which must be resolved, as they may recur in the new trial.

There was evidence that the defendant brought a .32 caliber handgun to the home of James Douglas on the day of the murders and left it there. Armed with a search warrant police seized the gun at the Douglas home. Some of the bullets were recovered from the victims. There was expert testimony that these bullets had been fired from the seized gun.

The defendant testified that he did not bring the .32 caliber handgun to the Douglas home. He said he saw it, for the first time, at the Douglas home on the day of the murders. On cross-examination he was shown five empty shell casings. He denied having seen them in his home or anywhere else.

The record is not clear whether defense counsel was informed of the existence of the empty shell casings before the trial.

During the trial the prosecuting attorney informed the court that he had told defense counsel that he would not object to an evidentiary hearing with respect to physical evidence which had not been introduced at the preliminary examination. It cannot be said that the defense had waived the

right to raise a constitutional objection to the use of the shell casings as evidence.

During the argument on the admissibility of such evidence, in the absence of the jury, the prosecuting attorney said that he was prepared to offer expert testimony that the shell casings had been fired in the .32 caliber murder weapon and that they were being offered in evidence as *circumstantial evidence* to impeach the testimony of the defendant that he first saw the gun in the Douglas home.

The court denied the defendant's request for a testimonial hearing, apparently on the theory that if the shell casings and testimony concerning them were used for impeachment purposes only, then the manner in which they were seized was of no significance. The court admitted the offered evidence for impeachment purposes only. The casings were received in evidence. The jury heard testimony that they had been found in a wastebasket in the defendant's home and heard expert testimony that they had been fired in the murder weapon.

The jury was not informed that the shell casings and testimony concerning them was not to be considered as substantive evidence of guilt. Except for the dying declarations of one victim, all of the evidence of defendant's guilt was circumstantial. The evidence concerning the shell casings was in fact substantive circumstantial evidence of the most damaging kind. The defendant, however, made no request for a limiting instruction, and for this reason we would not consider the omission to be reversible error. *People v Paul Mathis,* 55 Mich App 694; 223 NW2d 310 (1974).

Were the shell casings illegally seized? If so, were the casings themselves and testimony con-

cerning them available to the prosecution for impeachment purposes? We will examine the latter question first.

Michigan came to the exclusion rule long before it was mandated on the states by the United States Supreme Court.[2] In *People v Marxhausen,* 204 Mich 559, 573; 171 NW 557, 561 (1919), the Court ordered seized evidence be returned to the defendant before trial. Impeachment was not the issue but clearly, by ordering a return the Court did not anticipate that the exclusion rule may have had exceptions.

In *People v Marsh,* 14 Mich App 518; 165 NW2d 853 (1968), *rev on other grounds,* 383 Mich 495; 175 NW2d 780 (1970), this Court reversed and remanded for a new trial a conviction resulting from the use of an illegally obtained confession for impeachment of the defendant. Although it was a confession case, Judge (now Justice) LEVIN reviewed the entire history of the issue and cited the leading Federal cases concerning use of evidence obtained by an unconstitutional search and seizure for impeachment. In the interest of some brevity in a necessarily long opinion we incorporate his citations by reference.

Under *Agnello*[3] as modified by *Walder*[4] the evidence concerning the shell casings, if illegally obtained, could not have been used to impeach Wilborn.

In *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971), the Court refused to set aside a state court conviction obtained with the use of an illegally obtained confession for impeachment purposes.

---

[2] *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

[3] *Agnello v United States,* 269 US 20; 46 S Ct 4; 70 L Ed 145 (1925).

[4] *Walder v United States,* 347 US 62; 74 S Ct 354; 98 L Ed 503 (1954).

Did *Harris* overrule *Agnello?* A divided California Supreme Court has said that it did not. *People v Taylor,* 8 Cal 3d 174; 104 Cal Rptr 350; 501 P2d 918 (1972). The Tennessee Supreme Court has made the same decision. *Brewer v State,* — Tenn —; 501 SW2d 280 (1973). To the contrary may be *United States v Tweed,* 503 F2d 1127 (CA 7, 1974), where the United States Court of Appeals for the Seventh Circuit ruled that a dynamite-possession defendant who took the stand was properly impeached by the admission of expert testimony about chemicals found on his clothing which was illegally seized.

In *People v Graham,* 386 Mich 452; 192 NW2d 255 (1971), the Court went beyond *Harris* and ruled that a man's silence during interrogation could be used to impeach him. *Graham* apparently represents a willingness to re-examine the exclusion rule to the extent permitted by the United States Supreme Court, but it does not represent a determination that *Agnello* has been overruled. If the shell casings were illegally seized they may not be used for impeachment.

Were the shell casings illegally seized? If so, then a new trial would be mandated for this reason alone. It is strongly suggested by the record that they were obtained by a warrantless non-consensual search of the defendant's home when he was in custody, but we do not foreclose the prosecution's effort to justify the search at a future testimonial hearing.

Another critical issue involves the admissibility of evidence of certain statements attributed to Freddie Browner, one of the murder victims, before he died. In the absence of the jury, Clementa Browner, his mother, gave testimony which may be summarized as follows:

About ten o'clock she went to her second story bedroom, locked her bedroom door and went to sleep. Freddie Browner, his wife Alice, Willie J. Ringo, and Willie Yarbough were awake in the house. She went to sleep. About 2 a.m. she was awakened by someone banging on her bedroom door. Not receiving a response to an inquiry as to who was there, she attempted unsuccessfully to contact Freddie and Alice on an intercom system connected to her bedroom telephone. She took a pistol from a drawer and sat on her bed. All of a sudden she heard a loud bang and the door flew open. She observed Freddie lying outside the door, his head on a pillow, dressed only in his shorts, with a little blood coming from the back of his neck. Freddie told her he had been shot and asked her to get him a doctor. She suggested taking him to a hospital and he said, "Mother, you going to just let me lay here and die". She went to the house next door and persuaded them to call the police. After returning to the house Freddie said to her in response to her question as to who shot him, "Willie, Kay's Willie". On cross-examination she changed her version of Freddie's statement from Willie to Billie. While she was out of the house another witness heard another shot so it is possible that Freddie was shot the second time after she left the house. There was testimony which tended to identify the defendant as "Kay's Willie" or as "Kay's Billie". Freddie Browner made statements to other witnesses identifying defendant as the person who shot him, but a detailed description of the circumstances does not change the issue we have to decide. We are satisfied that there was sufficient evidence to support the trial court's decision that the statements qualify as dying declarations. *People v Johnson,* 334 Mich 169; 54 NW2d 206 (1952).

During the trial and on appeal the defendant challenges the admissibility of Browner's statements for another reason. He correctly argues that a dying declaration, being a substitute for sworn testimony, must be such as the witness might properly give on the stand if living. *People v Fritch,* 210 Mich 343; 178 NW 59 (1920). He argues that it was not disclosed that the dead witness actually saw his assailant and therefore his identification may have been hearsay or a statement of an opinion and not a recital of an observed fact. The problem has been the subject of annotations at 25 ALR 1370 and 86 ALR2d 905. The proper rule, in our opinion, is well stated in 40 CJS, Homicide, § 299c, p 1279, as follows:

"Positive statements as to the identity of the malefactor are always admissible in evidence when deceased was in a position to know the fact stated * * * but, where it was manifestly impossible that deceased could have seen his assailant * * * a mere expression of opinion as to who he was is not admissible as a dying declaration. Where, however, want of knowledge does not appear either from the statement itself or from other evidence in the case, it must be presumed that declarant stated a fact within his knowledge. *Under such circumstances it is a question for the jury whether the declarations represent the primary knowledge of deceased or merely his opinion."* (Emphasis added.)

There was circumstantial evidence that Freddie Browner saw his assailant. It was nighttime and the house was secure. There was no evidence of forced entry. All of the other victims were tied up, and there was evidence that he had been bound also. He knew that his wife was dead.

In a conference before jury arguments defense counsel informed the court that it was not known whether Freddie ever had an opportunity to see

who shot him. The record on appeal does not contain the final arguments but it is clear that the court did not prohibit the defendant's attorney from making such an argument, and from arguing that the declarations were not even made. We find no error in the admission of all of the statements attributed to Freddie Browner.

We find the defendant's challenge to the validity of the search warrant which was used to seize the murder weapon and the challenge to the legality of his arrest to be without merit. He may file timely pretrial motions challenging the validity of the seizure of all physical evidence except the items seized on authority of the search warrant.

Nothing in this opinion should be construed as an expression of opinion by this Court that the defendant is entitled to bail pending his trial.

All concurred.