PEOPLE v BATTLE

1. CRIMINAL LAW—INSTRUCTIONS TO JURY—AIDING AND ABETTING—
   ACCESSORIES AND PRINCIPALS.

   An instruction to the jury on aiding and abetting, where the
   information charged only the defendant with the crime, is
   proper because the distinction between accessories and princi-
   pals has been abolished and it is sufficient to merely charge a
   defendant as a principal.

2. CRIMINAL LAW—INSTRUCTIONS TO JURY—AIDING AND ABETTING.

   An instruction to the jury on aiding and abetting is proper where
   evidence is presented which points to the existence of persons
   procured by the defendant to commit the crimes charged.

3. SEARCHES AND SEIZURES—SEARCH WARRANTS—SUPPORTING AFFIDA-
   VITS—PROBABLE CAUSE—MOTION TO QUASH WARRANTS.

   An affidavit supporting a request for a search warrant is to be
   read in a commonsense manner, with great deference given to
   the magistrate's determination of probable cause; therefore,
   where the supporting affidavit adequately informed the magis-
   trate of the circumstances upon which a finding of probable
   cause for the issuance of a warrant could be based, the affidavit
   does not provide clear evidence that defense counsel committed
   a serious mistake by failing to file a motion to quash the search
   warrant.

4. CRIMINAL LAW—EVIDENCE—HEARSAY—PREJUDICE.

   The admission into evidence of a single hearsay statement was
   not so prejudicial as to require reversal where the prejudicial
   effect of the hearsay was mitigated by subsequent testimony
   and where the underlying danger of hearsay, that the declar-
   ant is not present and subject to cross-examination, was ren-
   dered harmless by the fact that the declarant was called to the

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law § 120 *et seq.*
    75 Am Jur 2d, Trial § 724.
[3] 68 Am Jur 2d, Searches and Seizures §§ 41–44, 64.
[4] 29 Am Jur 2d, Evidence § 493 *et seq.*

stand and cross-examined by defense counsel within the scrutiny of the jury.

Appeal from Recorder's Court of Detroit, Dalton A. Roberson, J. Submitted June 7, 1976, at Detroit. (Docket No. 24730.) Decided September 7, 1976. Leave to appeal denied, 399 Mich 808.

Robert L. Battle was convicted on two counts of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training and Appeals, and *Samuel C. Damren,* Assistant Prosecuting Attorney, for the people.

*Carl Ziemba,* for defendant on appeal.

Before: J. H. GILLIS, P. J., and T. M. BURNS and W. VAN VALKENBURG,* JJ.

J. H. GILLIS, P. J. A jury convicted the defendant of two counts of first-degree murder. MCLA 750.316; MSA 28.548. Defendant was given two concurrent life sentences and appeals.

On May 31, 1974, the bodies of Shelly Frazier (Shelly) and Willie Freeman Caruthers (Freeman) were found in a Monroe County ditch. The bodies had various bindings about the head and neck, and each victim had been shot through the head. The body of Freeman was bruised in the wrist area.

It was the opinion of Donald Chappell, the police sergeant who conducted the initial investigation of the bodies, that these people were shot at a different location. This opinion was based upon the fact that there was virtually no blood in the area

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

surrounding the dead bodies. An autopsy of these bodies revealed that the cause of death for each victim was a gunshot injury to the brain. The body of Shelly also contained several burn wounds. Further, the bruises in the wrist area of Freeman's body could have been caused by bindings.

The testimony elicited at trial indicated that the two victims, the defendant, and numerous other people attended a party in mid-May of 1974 at the residence of Sandy Henley (a/k/a Snake). Mr. Henley testified that the purpose of the party was to raise money in order to purchase a washing machine for his wife. During the course of the party, Henley discovered that $900 was missing from his residence. He threatened the guests with a gun and told them the money belonged to a dope dealer. Freeman accused the defendant of taking the money. The defendant denied this but left the party, returning later with approximately $700 which he turned over to Mr. Henley.

Deborah Griffith attended the party in question and gave the critical incriminating testimony. She testified that she was a prostitute who worked for the defendant. She knew the victims, Shelly and Freeman. Deborah testified that Shelly was one of defendant's women who went back and forth between defendant and Freeman. Deborah verified that at one point during the party Mr. Henley discovered that $900 was missing, and that the guests were held at gunpoint and not permitted to leave until the money was returned. Freeman accused the defendant of taking the money. Freeman, Snake, and two others searched the guests. Subsequently, the defendant was allowed to leave. After approximately one hour, he returned with a sum of money. Snake then allowed the guests to leave the premises.

The defendant left with Shelly, Deborah, and Ms. Frankie Davis (Frankie). Deborah testified that after leaving the party, the defendant stated, "if they couldn't pay him back he was going to kill them". Further, the defendant talked about getting a "contract out on Freeman or Snake if he didn't get his money back". Moreover, this was a frequent and recurring topic of conversation. At one point defendant said he "got a contract out on Freeman and Shelly" and "two" hit men were involved. Subsequently, Deborah saw Frankie and the defendant with two strange men. Frankie said the two were "hit men". The defendant also stated that the two men were "hit men". This occurred in Bobby's Record Shop, a store operated by the defendant.

Later, the time was fixed at approximately 2 p.m. a few days after Memorial Day, Deborah saw the two strange men accompany Shelly and Freeman into Bobby's Record Shop. The record shop then closed at approximately 2:30 p.m. and reopened at approximately 8 p.m. Deborah came to the shop and asked the defendant why he had closed. The defendant told her that "somebody had been taken care of in there" and "they were dead now, and that was it". After Deborah learned of the two deaths via television, the defendant told her that if anyone should ask about the victims she "didn't know anything".

Two other people present at the party testified that the defendant made statements to the effect that he wanted to kill Freeman. Macarthur Henley, Snake's uncle, testified that the defendant stated to Snake, "Let me kill him", referring to Freeman. The defendant said, "I'll give 'you $1,000 if you let me kill him". Octavia Kidd, another party guest, testified that the defendant told Snake

he would give Snake $1,000 if he (Snake) would let the defendant kill Freeman.

Ms. Frankie Davis' testimony was generally favorable to the defendant and in parts contradicted the testimony of Deborah Griffith. Frankie testified that she had been a prostitute in the past but presently she worked for the defendant in his record shop. Furthermore, Frankie and Deborah lived together and occasionally the defendant would stay with them. Frankie, Deborah and the defendant spent a considerable amount of time together in Bobby's Record Shop. Frankie considered the defendant to be her "fellow" but conceded that many ladies would probably "claim" him.

Frankie knew the victims. She also attended the mid-May party, and generally corroborated the testimony of the other witnesses concerning the missing money and the fact that the defendant was accused of having taken that money. She, however, recalled that Snake was the one who singled out the defendant and made accusations. She did not recall that Freeman accused the defendant of taking any money during the party. Frankie further testified that she did not know of any reason why the defendant would want to kill Freeman or Shelly. Frankie never heard any conversation about "hit men". She never told Deborah that the defendant had hired "hit men". Moreover, she testified that the victims were never in Bobby's Record Shop together, although Shelly had been in the shop sometime in May.

Finally, certain physical evidence provided a link between the victims and the defendant. Chesterene Cwiklik, a chemist employed with the Detroit Police Department, analyzed trace evidence taken from the basement of Bobby's Record Shop, the trunk of the defendant's car, and the victims'

clothes. Ms. Cwiklik testified that in her opinion
the bodies had been in the trunk of the defend-
ant's car. This opinion was based upon the exami-
nation of various fibers and hairs found on the
victims' clothes and found in the trunk of the
defendant's car. Based upon a similar analysis, it
was also this witness's opinion that the victims
had been in the basement of Bobby's Record Shop.
Furthermore, pieces of cloth bindings taken from
Freeman's body matched—same distinctive pat-
tern, fabric and weave—a wash cloth taken from
the record shop. The bindings also contained yel-
low paint smears which matched paint smears
found on gloves taken from the record shop. Fi-
nally, a piece of human tissue with hair attached
was also discovered in the record shop basement.

The defense was based upon the existence of
reasonable doubt. Defense counsel argued that
Deborah Griffith was not believable and that the
physical evidence did not absolutely place the
victims in Bobby's Record Shop or in the trunk of
the defendant's car. The defendant also put on a
witness, Mr. Alpha Jackson, who owned and oper-
ated a bump and paint shop. Mr. Jackson testified
that he worked on the defendant's car for 7 or 8
days beginning the day after Memorial Day of
1974. Mr. Jackson stated he had custody of the car
for the entire 7 to 8 day period. Hence, the defend-
ant argued that his car could not have been used
to transport the dead bodies.

The prosecutor's theory of the case was that the
defendant planned to kill Freeman and Shelly due
to a vengeful motive that intensified in the defend-
ant's mind during the mid-May party. The defend-
ant hired two unidentified men to carry out the
killings in execution fashion. Ultimately Freeman
and Shelly were murdered in the basement of the

defendant's record shop, and the bodies were transported to a Monroe County ditch in the trunk of defendant's car.

Defendant first argues it was reversible error for the trial court to instruct the jury regarding an aiding and abetting theory when the information did not charge anyone else with the crime except the defendant. We disagree. Due to the abolition of the distinction between accessories and principals,[1] it is now sufficient to merely charge the defendant as a principal in the information. *People v Hooper,* 50 Mich App 186; 212 NW2d 786 (1973), *lv den,* 391 Mich 808 (1974), *People v Lamson,* 44 Mich App 447; 205 NW2d 189 (1973), *lv den,* 389 Mich 783 (1973).

Next, defendant argues that the evidence adduced at trial did not support an aiding and abetting theory. Hence, it was improper for the judge to give an aiding and abetting charge. Defendant relies on *People v Parks,* 57 Mich App 738; 226 NW2d 710 (1975). However, that case merely held it is reversible error to give an aiding and abetting instruction where there is no evidence to support such a charge. See also *People v Ware,* 12 Mich App 512; 163 NW2d 250 (1968). In *Parks* the prosecution argued that an aiding and abetting theory was proper due to the existence of other unidentified fingerprints on objects found at the scene of the breaking and entering and due to the fact that the defendant was accompanied by another person when he cashed a stolen check. However, the Court opined that such evidence did not establish the existence of a principal.

In the instant case there is evidence which points to the requisite concert of action necessary under the aiding and abetting statute. Compare

_____

[1] MCLA 767.39; MSA 28.979.

*People v Williams #2,* 45 Mich App 630; 207 NW2d 180 (1973). The prosecution's theory was consistent throughout; that defendant contracted the killings and two unidentified men performed those killings. Deborah Griffith testified that the defendant said he hired "two hit men" to perform these killings. Subsequently, near the time of the killings, Deborah saw two strange men accompany the victims into Bobby's Record Shop. Deborah was told by the defendant that the two strangers were "hit men" and that people had been "taken care of" in his record shop. This evidence, if believed by the jury, supports a conviction on an aiding and abetting theory in that the evidence points to the existence of persons procured by the defendant to commit the crimes charged. Thus, we conclude the charge to the jury was a proper one. See *People v Wilborn,* 57 Mich App 277; 225 NW2d 727 (1975), *lv den,* 394 Mich 809 (1975), *People v Hodo,* 51 Mich App 628; 215 NW2d 733 (1974), *lv den,* 393 Mich 806 (1975), *People v Adams,* 35 Mich App 408; 192 NW2d 625 (1971), *People v Dawson,* 32 Mich App 336; 188 NW2d 676 (1971), *lv den,* 385 Mich 776 (1971).

Defendant next argues that his convictions must be reversed because he was denied the effective assistance of counsel. He bases his argument on the "serious mistake" branch of the ineffective assistance of counsel test.[2] The serious mistake alleged here is that trial counsel failed to make a motion to quash a search warrant authorizing the search of defendant's record shop and automobile. Defendant argues that the affidavit supporting the

---

[2] "Where the lawyer's mistake is of such serious proportion that it may have been decisive, where but for the lawyer's mistake the defendant might not have been convicted, the court may, despite failure to have preserved the error by timely objection, grant a new trial." *People v Degraffenreid,* 19 Mich App 702, 716; 173 NW2d 317 (1969).

warrant was clearly inadequate to establish probable cause for the search conducted pursuant thereto. Further, there could be no tactical advantage gained by not attacking the legality of the search, because the trace evidence seized as a result of the search provided a critical link between the victims and the defendant.

We find that in the instant case the supporting affidavit, as set out by the appellant,[3] adequately informed the magistrate of the circumstances upon which a finding of probable cause for the issuance of the warrant could be based. Such affidavits are to be read in a commonsense manner, and great deference should be given to the magistrate's determination of probable cause. *People v Coffey,* 61 Mich App 110; 232 NW2d 320 (1975), *lv den,* 395 Mich 772 (1975), *People v Iaconis,* 29 Mich App 443; 185 NW2d 609 (1971), *aff'd sub nom People v Bercheny,* 387 Mich 431; 196 NW2d 767 (1972). Hence, we do not agree that the face of the affidavit provides clear evidence that defense counsel committed a serious mistake by failing to file a motion to quash.

The remaining allegation of error meriting discussion concerns the admission of a single item of objectionable hearsay testimony. At a point in Deborah Griffith's direct examination the prosecutor asked her if the defendant said the two strange men were "hit men". Deborah replied that she asked Frankie who the men were, and Frankie

---

[3] The affidavit, based partially on the personal observations and knowledge of the executing police officer, indicated various factual links between the places to be searched and the victims, to-wit: 1) a possible murder weapon; 2) a distinctive multicolored cloth matching the material used to bind the victims; 3) that the victims were known to frequent the place to be searched; and 4) that the victims had been killed at a location other than the place of discovery. While no single item, standing alone, would provide an adequate basis for finding probable cause, the combination of factual allegations would provide a basis for the magistrate to find probable cause existed.

told her they were hit men. Defense counsel then objected[4] and an argument ensued over the admissibility of the hearsay statement. The prosecutor assured the judge that he could show a conspiracy existed between Frankie and the defendant, thus making the statement admissible under a recognized exception to the hearsay rule.[5] The trial court then took the objection under advisement pending the showing of concert of action between Frankie and the defendant. Such a showing did not occur, and the trial judge subsequently ruled the statement inadmissible. Defense counsel, however, declined the offer of a curative instruction to the jury regarding the matter. Defendant now argues on appeal that the admission of the single hearsay statement was so prejudicial as to require reversal.

Whatever prejudicial effect the objectionable hearsay had on the proceedings was mitigated by subsequent testimony. Soon after the hearsay statement, the prosecutor asked Deborah whether she talked to the defendant about the two strange men. Deborah said she did and that the defendant told her the two were "hit men". Moreover, Frankie subsequently testified and denied that

[4] At trial defense counsel opted for a mistrial rather than a curative instruction. We note that the test for a mistrial motion is not whether there are some irregularities but instead did the defendant have a fair and impartial trial. *People v Watson,* 307 Mich 596; 12 NW2d 476 (1943), *People v Clark,* 57 Mich App 339; 225 NW2d 758 (1975), *People v Foster,* 51 Mich App 213; 214 NW2d 723 (1974), *lv den,* 392 Mich 778 (1974). The effect of the hearsay testimony could have been further modified by an instruction from the trial judge; however, defense counsel declined the judge's offer to cure the error. We do not think a mistrial was the exclusive remedy appropriate here.

[5] Evidently the prosecutor intended to show that the statement made by Frankie was a declaration by a co-conspirator made while the conspiracy was pending and in furtherance of the objective of that conspiracy. *See, e.g., People v Trilck,* 374 Mich 118; 132 NW2d 134 (1965), *People v Shepherd,* 63 Mich App 316; 234 NW2d 502 (1975), *People v Adams,* 48 Mich App 595; 210 NW2d 888 (1973).

there was ever any conversation in her presence about "hit men" or plans to kill the victims. We think that under these circumstances the effect of the single hearsay statement was greatly ameliorated. *Cf. People v Vargas,* 50 Mich App 738; 213 NW2d 848 (1973), *lv den,* 392 Mich 815 (1974), *People v Harrison,* 49 Mich App 546; 212 NW2d 278 (1973), *lv den,* 392 Mich 779 (1974). The underlying danger of hearsay testimony—that the declarant is not present and subject to cross-examination—is rendered harmless and moot by the fact that the declarant, Frankie Davis, was called to the stand and cross-examined by defense counsel within the scrutiny of the jury. *People v King,* 58 Mich App 390; 228 NW2d 391 (1975), *People v Rea,* 38 Mich App 141; 195 NW2d 809 (1972), *lv den,* 388 Mich 795 (1972).

We have examined the remaining allegations of error and find them to be without merit.

Affirmed.